567 A.2d 610

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Donald Mitchell TEDFORD, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 25, 1989.

Decided Dec. 13, 1989.

Reargument Denied April 3, 1990.

Peter H. Shaffer, Office of the Public Defender, Butler, for appellant.

David L. Cook, Dist. Atty., David A. Hepting, Robert F. Hawk, Asst. Dist. Attys., Butler, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

On February 6, 1987, the appellant, Donald Mitchell Tedford, was convicted by a jury of the First Degree Murder and Rape of Jeanine Revak. Following the guilty verdicts, a separate sentencing hearing was held pursuant to the Sentencing Code, 42 Pa. C.S.A. § 9711 and the jury unanimously returned a sentence of death. The appellant did not file timely post trial motions. On March 20, 1987, the lower court sentenced the appellant to death on the First Degree Murder conviction, and a consecutive term of imprisonment of 8½ to 17 years on the Rape conviction.

Subsequently, the appellant sought and received permission to file Post Verdict Motions, nunc pro tunc which he filed on April 27, 1987. The appellant amended his nunc pro tunc Post Verdict Motions on November 23, 1987, again on January 4, 1988 and still again on February 19, 1988. The lower court, in a Memorandum Opinion and Order dated April 29, 1988, denied appellant's Post Verdict Motions setting the stage for this automatic appeal pursuant to 42 Pa. C.S.A. § 9711(h)[1] which followed.

## I.

The facts of this case are as follows: In the fall of 1985, the victim Jeanine Revak, a 22-year-old woman who had been married for eight months, was seeking to pursue a career in interior decorating. She had studied interior design at the Art Institute of Pittsburgh and was attempting to obtain full-time employment in that field. During that time she held two part-time jobs. She worked as a part-time floral designer at a flower shop known as By Janice Flower Shop. Also, she worked part-time as an interior designer for a company called Decoratif's.

In late October or early November, 1986, Jeanine Revak visited an interior design and decorating store in the Cranberry Shopping Plaza, Cranberry Township, Butler County, known as The Finishing Touch. The Finishing Touch store in Cranberry was a part of a two store interior decorating business owned by Robert Sasso. There, Jeanine Revak met the appellant Donald M. Tedford who was employed by Robert Sasso, and was in charge of the Cranberry Plaza store. At that time, the appellant was an inmate at the State Correctional Institution in Greensburg, Pennsylvania, but had achieved acceptance into a work release program which permitted him to leave the prison daily to work at his job at The Finishing Touch. The victim presented her

1. 42 Pa.C.S.A. § 9711(h)(1) provides:
 (h) *Review of death sentence.*—
 (1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

portfolio to the appellant and inquired about possible employment. The appellant interviewed the victim and examined the portfolio with her. Although the victim was not offered a position at that time, she apparently was encouraged by the appellant that a job may soon be available and that she should keep in touch with him.

On Friday, January 10, 1986, the victim was recovering from an illness which caused her to be absent from her two part-time positions all of the previous days of that week. Because of her illness, she was not scheduled to work at either of her jobs. When her husband, James Revak, left for work at 7:30 a.m. that morning, she told him that she intended to stay at home all day. During the day, from his job, James Revak telephoned home to talk to his wife but there was no answer. Also, Grace Labrise, who worked with the victim at By Janice Flower Shop attempted to reach the victim by telephone five or six times during that day. Ms. Labrise's first call was in the morning at approximately at 10:00 o'clock a.m. Her last call was placed sometime in the afternoon. Each time Grace Labrise called she did not get an answer. When James Revak returned home from work at approximately 5:30 p.m., the victim was not there. Her nightgown was on the bed and some of her clothes were strewn about on the upstairs floor. James Revak testified that it was very unusual to find his wife's clothes thrown about on the floor. Further, he found no note explaining her absence.

Meanwhile, at approximately noon on Friday, January 10, 1986, Gary Scheller, a truck driver for Bennett Supply Company, stopped at The Finishing Touch in Cranberry Plaza with a delivery of a container of glue. When he arrived he parked his truck and carried the product to the door. He attempted to enter the store through the front door but found that the door was locked. Just as he set the container on the ground, the appellant opened the door and let him in the store. Mr. Scheller saw a very attractive young lady in the store with the appellant. The appellant admitted that the attractive young lady in the store at the

time of the delivery was the victim Jeanine Révak. Mr. Scheller asked the appellant if the store was closed for lunch. The appellant answered that they, the young lady and he, were getting ready to go out on a service call.

Lynn Kampers, an employee of The Finishing Touch at the other location at Babcock Boulevard, Allegheny County, testified that she saw the appellant on the morning of January 10, 1986, when she brought his pet cat back to him at the Cranberry store. Because of a sensitive burglar alarm the cat could not be left alone in the store overnight. As a favor to the appellant, she had taken the cat home with her the previous evening. Lynn Kampers testified that, on that Friday morning, she noticed the appellant looked rather tired and smelled of alcohol. Later that day, at approximately 4:30 p.m., she spoke to the appellant on the telephone when he called the Babcock Boulevard store and asked for permission to close early. Appellant told Ms. Kampers it was a quiet day; that he was not busy at all. It is unclear from the record whether appellant was given permission to close early.

Elizabeth Manuel, a friend of the appellant Donald Tedford, telephoned the appellant at The Finishing Touch on Friday, January 10, 1986, after she arrived home from work. It was approximately 5:30 p.m. when she placed the call. She remembered, that the appellant answered the phone that day by just saying "hello." Every other time she had called him at the store he answered by saying "The Finishing Touch," even when the store was closed. She asked appellant if they were going to get together later that night. Appellant told her he was real busy, and he asked if he could call her later. Since she had to leave the house and run some errands, she called appellant again at about 6:00 p.m. Appellant said he was swamped with work and he would call her later. When Ms. Manuel left to go on her errands, she drove past The Finishing Touch. She noticed that the store was dark. She said that normally, the store is lit up at night, with spotlights on the displays. Appellant did call her twice later that evening and then

visited her house, arriving at about 9:30 p.m. He was wearing jeans, a ski sweater and boots. The appellant stayed until about 11:00 p.m. when he told Ms. Manuel he had to leave and go to the north side of Pittsburgh to meet a friend. He mentioned that he belonged to a Vietnam Veterans group and one of the persons in that group was in some trouble.[2] He asked if he could come back later. Ms. Manuel agreed to leave the door open for appellant and he did return at about 4:00 a.m. When he arrived back, Ms. Manuel was in bed. She did not notice what the appellant was wearing when he returned. The next morning, however, as he was leaving, she did notice that he was wearing shoes instead of the boots he was wearing the previous evening. Ms. Manuel identified the ski sweater offered in evidence as the sweater the appellant was wearing when he was at her home on Friday evening, January 10, 1986.

Linda McNamee, a friend of the appellant, testified that she stopped by The Finishing Touch on Friday, January 10, 1986, to pay a social call on Donald Tedford. It was approximately 5:30 p.m. when she arrived. She observed that the inside of the store was dark except for a light shining in the office toward the rear of the premises. Every other time that she had been to or had gone by The Finishing Touch after dark, the premises were well lit. On this particular evening, the premises were dark. She knocked on the door and stood outside for about three minutes. Just as she was preparing to leave, she noticed one of the buttons on the telephone begin to blink, indicating an incoming call. When the blinking stopped and the line remained lit, she knew that someone was in the store and had answered the phone. She knocked again and waited a while longer. The appellant, wearing jeans and a

**2.** Appellant's explanation for leaving at that time was untrue. When he left Ms. Manuel's home he did not go to the north side of Pittsburgh to help a friend in trouble. Rather, he drove to The Finishing Touch were he stayed for a while. Later he was seen at the Gulf Station next to the Cranberry Plaza. Still later he stopped at a friend's apartment in the community of Sharpsburg, a suburb of Pittsburgh, where he freshened up before returning to the Manuel residence.

ski sweater finally came to the door and, by means of hand signals, he told her that he could not let her in the store because the door was locked and he did not have the key. The appellant indicated that the owner of the store had been there earlier and had taken the key to the door with him when he departed. Ms. McNamee left and went home. Later, at about 7:00 p.m., she placed a phone call to The Finishing Touch. The appellant answered the phone. He explained again that he could not open the door and let her in when she was at the store earlier because the owner had taken the key. Contrary to appellant's explanation, the evidence established that Robert Sasso, the owner of the store, was not at The Finishing Touch premises in Cranberry at any time on Friday, January 10, 1986, and the appellant's story about the owner taking the key was a fabrication. Further, even if the front door was locked and he did not have the key, the store had a rear door with a panic bar which the appellant could have easily opened to allow Ms. McNamee to enter.

Later that evening, when the victim did not come home, James Revak attempted to locate her. He called the places where she was employed without success. At about 11:30 p.m. he called The Finishing Touch. The appellant, who identified himself as "Don," answered the phone. James Revak explained who he was and asked the appellant if he remembered his wife Jeanine. The appellant indicated that he did remember her; that she was a very talented girl; but, he had not seen her that day. On Saturday morning James Revak called the Cranberry Township Police and reported his wife Jeanine missing.

Raymond Eppinger, testified that he was employed at the Gulf service station next to the Shopping Plaza where The Finishing Touch is located. He began work at 10:00 p.m. on Friday, January 10, 1986. At approximately 1:00 a.m., one hour past midnight on Saturday, January 11, 1986, the appellant stopped at the Gulf service station in a dark color 280–Z automobile and bought a pack of Pall Mall cigarettes. He had a brief conversation with appellant about a truck

that was parked in the shopping plaza and then left. Other evidence established that the appellant did drive a dark color 280–Z and smoked Pall Mall cigarettes.

Alice Sloan worked at The Finishing Touch with the appellant. On Saturday morning January 11, 1986, her automobile was being repaired. Ms. Sloan, knowing that she would not have her automobile for transportation on Saturday morning, arranged to have the appellant drive her to work. Appellant, as arranged, picked up Ms. Sloan at her home in his green, 280–Z Datsun automobile. She remembers that appellant's vehicle was very clean, inside and outside, and she mentioned this to the appellant. The appellant told her that he had just cleaned his car.

At about 9:30 or 10:00 a.m. on Saturday morning, Mr. Revak, along with his father-in-law, went to The Finishing Touch. There they met the appellant, identified themselves, referred to the phone call the previous night, and inquired about the victim. The appellant reiterated that he had not seen her. The appellant asked for a telephone number where he could reach Mr. Revak in case he would happen to see the victim. James Revak wrote his unlisted telephone number (which was also the victim's number) on a piece of paper and left it with the appellant. Evidence showed that this request was unnecessary as appellant already had the victim's telephone number written on his desk blotter. Later, James Revak found the victim's automobile parked some distance away in the Pines Plaza Shopping Center, but no trace of the victim.

On Saturday, January 11, 1986, David Lijewski and his brother Harry were out hunting small game in State Games Lands in Washington County, Pennsylvania. (It was the last day of the extended small game season.) The weather that Saturday was rather pleasant for January. It was generally a nice day, with the temperature between the mid 30's and 40 degrees. At approximately 12:30 p.m., while walking along the shoulder of a single lane, rural, black top road, David Lijewski came across a young woman's body. The shoulder of the road consists of gravel and earth,

running over a slight embankment and turning into brush. According to David Lijewski, the body was lying about 6 or 7 feet off the shoulder of the road. The rigid state of the body and its discoloration led Mr. Lijewski to believe that she was dead. Neither he nor his brother touched or disturbed the body or the area around the body. The dead woman was wearing a red jacket, black slacks, and a white blouse. After making this grim discovery, David and Harry Lijewski gathered their hunting dogs and walked back to the car. David stayed at the car while Harry walked to the nearest house and called the police.

Edward S. Peters, a Pennsylvania State Police Criminalist Investigator arrived at the scene of the body at approximately 1:00 p.m. When he arrived, State Trooper George Titler, who had arrived a short time earlier, was photographing the scene. David and Harry Lijewski were also at the scene. The body of the victim was lying in the exact position that it was found. She had on a red jacket, a silk blouse, black slacks, one mesh stocking, gold earrings, gold necklace and wedding band. She was not wearing shoes. The missing stocking and missing shoes were never found. When the body was turned over it was discovered that her slacks were unfastened and the zipper was down. When the investigator checked under her blouse he found that her bra was pushed up over her breasts. The slacks and jacket were relatively clean except for the presence of some foreign items which were identified as blood, weeds, and thin, fiber type material. The body was examined at the scene, placed in a plastic body bag and transported to the Washington County Hospital Morgue where an autopsy was performed.

The Chief Deputy Coroner of Washington County, Ernest L. Abernathy, performed the autopsy and determined the cause of death to be ligature strangulation. A cord ligature, a rope-like structure, was placed around her neck and tightened very tightly until it produced death. An external examination of the body revealed that the victim had bruises on her left shin—sort of an abrasion, scraping mark.

There were bruises on her right leg. There was considerable reddish discoloration of the left hand. A laceration on the back of the head had produced a great deal of hemorrhage. A small depressed mark in the form of a little scratch or bruise was noted above the left eyebrow. The autopsy further revealed that the victim's lungs were completely collapsed in the chest cavity. The collapsed lungs indicated that air was cut off and totally blocked. There was sharp line on her larynx corresponding to the ligature mark on her neck. There were hemorrhages in the thyroid gland and some small hemorrhages in the conjunctiva of the eye. There was bloody fluid in her windpipe. Examination of the brain revealed a contrecoup wound. The coroner explained that this is a wound which occurs when someone is hit on one side of the head and the brain hits against the opposite side of the skull, so the damage is produced on the side opposite from the external impact. There was a heavy blow with hemorrhage on the right back of the head and hemorrhage over the brain mostly on the left front of the brain. The hemorrhage overlying most of the left front of the brain was quite extensive.

The body, when found, was sprawled and in an unnatural position. This suggested that the victim died elsewhere, and rigidity was complete when the body was dropped where it was found. The Deputy Coroner stated that since this was a violent death and the victim was a young woman with well developed muscles, that rigor mortis would come on quite quickly—possibly within an hour or two.

The Commonwealth introduced into evidence the slip of paper which set forth the name "Jim Revak" and his unlisted telephone number. This was the paper given to the appellant by the victim's husband on Saturday morning, January 11, 1986 when the appellant asked him where he could be reached. Also introduced into evidence was an old calendar page taken from a blotter on a desk at The Finishing Touch with the victim's unlisted phone number written in the appellant's handwriting in the lower left hand corner. The victim's unlisted phone number was known to

the appellant before it was given to him by Mr. Revak that Saturday morning. (R. 111.)

From January 10, to January 12, 1986, the appellant had a furlough from prison. He was scheduled to be back in his cell at 9:00 p.m. on Monday, January 13, 1986. He did not report back at that time. His failure to return was reported immediately to the State Police. Since the appellant was employed in Cranberry Township, the State Police transmitted the report to the Cranberry Township Police Department that appellant was considered an escapee.

On Monday night, January 13, 1986, Elizabeth Manuel was interviewed by the state police at the Cranberry Police Station. After her interview, officer Jeff Widdowson of the Cranberry Township Police escorted Ms. Manuel home from the police station. When they arrived at her residence both of them noticed a white Ford automobile parked between Ms. Manuel's residence and the neighboring house. Officer Widdowson found the appellant asleep behind the wheel with the motor running. After radioing for assistance and waiting a reasonable time for help to arrive, Officer Widdowson arrested the appellant and took him into custody. The appellant was arrested on the basis of the state police advisory that he was a fugitive for failing to return to prison when his furlough ended.

Pursuant to a Search Warrant, authorities seized head hairs, pubic hairs, blood and saliva of the appellant. The pubic hair found on the victim's panties was consistent with the pubic hair of the appellant. Two stains on the victim's slacks were examined and found to contain seminal fluid. Tests of the vaginal area including vaginal swabs indicated the presence of sperm cells and seminal fluid. Tests involving blood groupings and genetic characteristics revealed that the seminal fluid could have been deposited by the appellant. Those same tests ruled out the possibility of the seminal fluid being deposited by her husband.

Additionally, appellant's ski sweater, removed from appellant's car pursuant to a search to which he consented was introduced into evidence. Red synthetic fibers removed

from the victim's blouse and red synthetic fibers removed from appellant's ski sweater were found to have the same microscopic characteristics. The ultimate source of those fibers could not be determined. Certain polyprophyrin fibers obtained from the victim's jacket and from carpet backing from The Finishing Touch were microscopically examined and it was determined that they matched. Certain vegetable fibers found on the victim's clothing were microscopically examined and compared with vegetable fibers taken from The Finishing Touch and it was determined that they were similar. The clothing of the victim was loaded with lint and was not in a condition that you would expect a person to wear. The victim's house and wardrobe were examined and it was determined that the fibers found on her clothing could not have come from her home or wardrobe. Pennsylvania State Police Criminalist Scott Ermlick testified that it is unusual to find three different types of foreign fibers on a victim's clothing. He testified that, contrary to popular belief, it is *not* very common to find a cross transfer of fibers and hairs.

Michael Ferry, a prisoner at the Armstrong County Jail testified that sometime after appellant's arrest, he met and got to know appellant while he and appellant were together in the Butler County Jail. (TT., p. 379.) He played cards with the appellant and helped him and others with legal questions and court papers. (TT., p. 380.) Michael Ferry testified that the appellant told him that the victim, Jeanine Revak, had come to The Finishing Touch seeking employment. The appellant said that he promised to give her a job. (TT., p. 380.) On the day in question, appellant said he phoned the victim and told her he was on the road working and he needed her help. (TT., p. 380.) If she wanted to work she was to come and meet him at a place that was away from the store. (TT., p. 380.) He did not meet her at The Finishing Touch. (TT., p. 380.) She agreed and met the appellant at the place he designated. (Apparently, that place was the Pines Plaza Shopping Center where the victim's automobile was found.) The appellant said that he

took the victim in his automobile and, on the pretense that he had to stop back at the store, he drove to The Finishing Touch premises. (TT., p. 380.) The appellant described the victim as "good looking" and having a "nice body." (TT., p. 380.) Sometime after they arrived at the store, the appellant made a pass at the victim which she resisted. (TT., p. 380–81.) The appellant said that he was "hot" for her and he persisted in his efforts to seduce her. (TT., p. 381.) The appellant said that the victim kept resisting and became upset and frightened, but he eventually forced her to engage in a sexual act with him. (TT., p. 381.) Appellant stated that the forced sex caused the victim to become more upset and hysterical. She would not calm down. The appellant said he had to "ring her neck." (TT., p. 381.) The appellant told Michael Ferry that he killed the victim because he was concerned that she might report him to the police and he would lose everything he had, including his work release status. (TT., p. 381.) Finally, the appellant, in responding to a question about his automobile, told Michael Ferry that he, the appellant, thoroughly cleaned his car, going over it with a "finetooth comb." (TT., p. 382.) Michael Ferry testified that he discussed the crime with the appellant several times and it was over the course of those several conversations that the appellant told him how he lured the victim to the store, forced her to have sex with him and then killed her to prevent her from reporting him to the authorities.

Christopher White met the appellant in the Butler County jail sometime after the appellant's arrest. He came to know the appellant by bringing him his meals everyday. (TT., p. 408, 415–16.) Occasionally he would talk with the appellant about the crime the appellant was charged with committing. Christopher White testified that the appellant told him he had raped and killed the victim, Jeanine Revak. (TT., p. 409.) The appellant told White that he killed her because, "he figured she was going to go to the police," and report the rape. (TT., p. 409.) The appellant told him that

after he murdered the victim, he dropped her body in a wooded area in Washington County. (TT., p. 422.)

Officer Bernard W. Stanek of the Pennsylvania State Police testified that a piece of the information that Michael Ferry said he had obtained from the appellant was previously unknown to the police, namely, the information pertaining to the reason why the victim's automobile was found in the Pines Plaza Shopping Center, almost a mile from The Finishing Touch. The fact that the appellant arranged to meet Jeanine Revak on the road, away from The Finishing Touch store premises explained why the victim's car was located at a distant shopping plaza.

The appellant, testifing on his behalf, stated that he met Jeanine Revak in late October or early November, 1985 when she came to The Finishing Touch store in search of a job and presented her portfolio to him. Appellant stated that after that first meeting, he and the victim formed a friendship. He said that she would stop by the store once or twice a week. When she did not stop to see him, she would call. According to the appellant he and the victim eventually developed a close intimate relationship. He stated that once a week they would have sexual intercourse on the floor of his office. The appellant testified that a little before 12:00 noon on Friday, January 10, 1986, the victim unexpectedly walked into The Finishing Touch store to see him. Shortly after the victim arrived, a delivery man from U.P.S. made a delivery to the store. Appellant stated that soon after the delivery man left, he and the victim went into his office where the victim disrobed and they had sexual intercourse on a mat he placed on the floor. According to the appellant, after he and the victim had sex, the victim dressed and left the store. Appellant stated that the victim was in The Finishing Touch store that day for a total of thirty to forty-five minutes. He said that after she departed he did not see or hear from her again. It is evident from the verdict that the jury did not believe that appellant's sexual contact with the victim on January 10, 1986 was consensual as he claimed.

■ While the appellant does not specifically contest the sufficiency of the evidence to sustain the convictions of Murder of the First Degree and Rape, we are nonetheless required to review the record and test the sufficiency of the evidence for murder. Having done so, not only for murder but also for rape, we find compelling evidence to support the jury's verdict beyond a reasonable doubt. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), cert. denied 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Although there were no eyewitnesses to the rape and murder, there is sufficient circumstantial evidence of guilt. "Circumstantial evidence can be as reliable and persuasive as eyewitness testimony and may be of sufficient quantity and quality to establish guilt beyond a reasonable doubt." *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167, 1173 (1986) citing: *Commonwealth v. Pronkoskie*, 498 Pa. 245, 445 A.2d 1203 (1982); *Commonwealth v. Berrios*, 495 Pa. 444, 434 A.2d 1173 (1981); *Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837 (1973); *Commonwealth v. Cimaszewski*, 447 Pa. 141, 288 A.2d 805 (1972). The evidence in this case is sufficient to prove beyond a reasonable doubt that the appellant raped and murdered Jeanine Revak. The victim was strangled; and she had sperm and seminal fluid in her vagina and on her clothing. The sperm and seminal fluid was consistent with the appellant's blood groupings and genetic characteristics. Further, in his conversations with Michael Ferry and Christopher White, the appellant admitted forcing the victim to have sex with him and then killing her to prevent her from reporting the rape to the police.

II.

■ The appellant argues first that it was error for the lower court to deny his motion for a change of venue for the reason that the pretrial publicity was extensive and sensational, and pervaded the entire community. We disagree.

The standards applicable to a motion for a change of venue are well settled:

> The grant or denial of change of venue is a matter within the sound discretion of the trial court, and its exercise will not be disturbed by an appellate court in the absence of an abuse of discretion.

*Commonwealth v. Buehl,* 510 Pa. 363, 375–76, 508 A.2d 1167, 1173 (1986), citing: *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985); *Commonwealth v. Romeri,* 504 Pa. 124, 470 A.2d 498 (1983); *Commonwealth v. Bachert,* 499 Pa. 398, 453 A.2d 931 (1982); *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Hoss,* 469 Pa. 195, 364 A.2d 1335 (1976). Accord: *Commonwealth v. Cohen,* 489 Pa. 167, 413 A.2d 1066 (1980). The trial court, who is closest to the pre-trial news reports and events, is in the best position to measure community atmosphere and determine the necessity for a venue change. *Commonwealth v. Buehl, supra.; Commonwealth v. Rigler,* 488 Pa. 441, 412 A.2d 846 (1980).

> "In reviewing the trial court's decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pre-trial publicity."

*Commonwealth v. Kichline,* supra, 468 Pa. at 274, 361 A.2d at 287.

> Normally, one who claims that he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the empaneling of the jury.... But this rule is subject to an important exception. In certain cases there "can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual jury prejudice," ... because the circumstances make it apparent that there is a substantial likelihood that a fair trial cannot be had.

*Commonwealth v. Holcomb,* 508 Pa. 425, 443, 498 A.2d 833, 842 (1985), citing: *Commonwealth v. Romeri, supra.*

However, a presumption of prejudice pursuant to this exception mandates the presence of exceptional circumstances. It is difficult to accept generalizations in this area in that "each case must turn on its special facts." *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978). *Casper* goes on to state: "It is clear that the mere existence of pre-trial publicity does not warrant a presumption of prejudice. Similarly, a possibility that prospective jurors will have formed an opinion based on news accounts will not suffice." *Id.* at 151–52, 392 A.2d at 291–92. *Casper* continues by quoting *Irwin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961):

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

We, nevertheless, have acknowledged, as noted *supra.*, that there are times when the pre-trial publicity is so pervasive and so inflammatory that the accused is relieved of his normal burden of establishing actual juror prejudice. Pre-trial prejudice is presumed if: (1) the publicity is sensational, inflammatory, and slanted towards conviction rather than factual and objective; (2) the publicity reveals the accused's prior criminal record, if any, or if it refers to confessions, admissions, or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports.

*Commonwealth v. Pursell,* 508 Pa. 212, 221, 495 A.2d 183, 187 (1985), citing: *Commonwealth v. Romeri, supra.* Additionally, it is important to determine "whether there has been such a 'cooling-off period' between the publicity and the commencement of trial that the prejudicial effect of the publicity may be deemed to have dissipated." *Commonwealth v. Casper, supra,* 481 Pa. at 154, 392 A.2d at 293.

In this case, the body of the victim was discovered in early January, 1986. The appellant was charged with the murder and rape of Jeanine Revak in late February, 1986. The appellant was originally scheduled to be tried on those charges in June, 1986. Most of the publicity concerning the crime and the appellant's arrest occurred at that time, between January and June of 1986. For the most part, the publicity associated with this crime had dissipated by late January, 1987 when trial commenced. During the last week of January, 1987, when jury selection began, the start of the trial was reported in the local newspapers, in newscasts over local radio stations, and in a news sheet published by one of the local radio stations. These news reports told of the charges against the appellant and, in some instances mentioned the appellant's work release status.

At the start of jury selection, appellant raised the issue of pre-trial publicity and the possibility that prospective jurors may have been exposed to prejudicial publicity. He stopped short of a motion for a change of venue at that time, but suggested to the court that such a motion may become necessary as voir dire progresses. Appellant asked, that because of the pre-trial publicity, he be granted wider allowance in the questions he could ask on voir dire. The trial court agreed to and did give appellant wide leeway in his questions to prospective jurors. On the sixth day of voir dire, the appellant moved for a mistrial and a change of venue based upon prejudicial pre-trial publicity generated that week through newspaper articles and radio broadcasts reporting on the commencement of trial. Appellant's motions were denied. Later that same day, the appellant

renewed his motion for a change of venue which again was refused by the trial court.

In this case 159 prospective jurors were individually examined. Of these 159 veniremen, 77 remembered reading or hearing about the crime at the time that it happened. Of these 77 who had some memory of the circumstances of the case, 43 remembered reading or hearing only that the crime did happen; 9 recalled some of the details of the crime; 21 remembered some of the details of the crime and that the appellant was on work release or he had a previous criminal record; and 4 heard some details in the court house from other prospective jurors. Of the remaining 82 veniremen, 11 had no knowledge of the crime or of the appellant, and 71 were excused for reasons unassociated with pre-trial publicity. Even though most of the prospective jurors questioned about prior knowledge had read or heard something about the crime, only nine had formed an opinion that the appellant was guilty. None of those finally seated as jurors in this case had formed a fixed opinion of guilt. Of those finally selected, three stated that they had no previous knowledge of the crime, nor did they know anything about the appellant. The remainder could only remember that such a crime was reported. None of them, however, recalled any of the details. All of the jurors selected and seated unequivocally stated that they were able to decide the case solely on the basis of the evidence presented and the law as would be explained to them by the court.

The record demonstrates that the trial judge was particularly protective of the appellant's right to a fair trial before an impartial jury throughout the jury selection process. Some potential jurors, who stated they recently had read certain accounts of the crime which mentioned appellant's record or work release status, were excused for cause, without inquiring into actual prejudice. The jurors were kept separated, including those who were excused. Those who were selected were immediately sequestered and remained sequestered until a verdict was returned and the sentencing hearing was concluded. Based upon the entire

record, we conclude that the jurors selected were fair and impartial and entirely capable of fulfilling their sworn duty of deciding the case solely on the evidence presented at trial.

## III.

Next, the appellant argues that the lower court erred in refusing to grant his motions for a mistrial and/or change of venue for the reason that the jury panel was tainted by the general knowledge of appellant's previous criminal record. This argument is akin to appellant's first argument that the pre-trial publicity was so extensive and pervasive in the community that it was impossible to enpanel a fair and impartial jury. Here, the appellant refines his argument and urges that because a small number of potential jurors heard comments that appellant had a prior criminal record, the entire panel was tainted and a mistrial and/or a change of venue should have been granted. In support of his argument, appellant refers to a certain news sheet distributed by a local radio station, WISR, which referred to the fact that the appellant was on a work release program.[3] The appellant cites a string of cases involving issues of jury prejudice, including: *Commonwealth v. Stewart*, 449 Pa. 50, 295 A.2d 303 (1972), (victim's father on the panel from which jury was selected); *Commonwealth v. Harkins*, 459 Pa. 196, 328 A.2d 156 (1974), (prospective jurors who heard a remark by one of the veniremen that the accused had stolen his car, were selected and seated on the jury); *Commonwealth v. Bobko*, 453 Pa. 475, 309 A.2d 576 (1973), (a trial booklet setting forth the

---

**3.** The WISR News Sheet dated January 26, 1987, contained, among other things, the following item:

TRIAL BEGINS ........ Jury selection starts today in the murder trial of 34 year old Donald Tedford, the man accused of killing 22 year old Jeanine Revak of Cranberry Township last January. The trial was originally scheduled for last June, postponed until September, and then continued until this month. The Cranberry Township woman was raped and strangled last year, and her body found in a remote area of Washington County. State police arrested Donald Tedford in alleged connection with the crime in late February. Tedford had been on work release from prison when the crime occurred.

accused's prior criminal record was distributed to all members of the jury panel); and *Commonwealth v. Santiago,* 456 Pa. 265, 318 A.2d 737 (1974), (during a murder trial, three regular jurors, while on a recess were approached and told that the defendant had killed an innocent boy and that the victim was not the first person the accused had killed). None of these cases cited by appellant are analogous to the present case.

Our review of the record indicates that the steps taken by Judge Rauschenberger in the instant case: (a) in summarily striking jurors who indicated they recently had read a prejudical account of the crime; (b) in granting appellant great leeway in questioning prospective jurors; and (c) in immediately sequestering the jurors who were selected, adequately served, under circumstances here, to insure the selection of a fair, impartial and untainted jury.

## IV.

The appellant next argues that it was error for the trial court to permit the introduction of evidence that the appellant was on work release from Greensburg State Correctional Institution at the time of the rape and murder of the Jeanine Revak. The appellant argues that this evidence served no compelling purpose and was so inherently prejudicial as to deny him a fair trial.[4] The trial court ruled that evidence of appellant's work release status was admissible for three purposes:

1. To establish the appellant's motive for the murder;

2. To demonstrate premeditation in the appellant's planning of the rape and murder; and

3. To prove consciousness of guilt through the appellant's escape.

The admissibility of evidence is a matter addressed to the sound discretion of the trial court and we may reverse evidentiary rulings only upon a showing that the trial court

4. Only the bare fact that appellant was on a work release from prison was admitted into evidence. The reasons for appellant's incarceration and his prior criminal record were not presented to the jury.

abused its discretion. *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491 (1988). Evidence of crimes other than that for which the accused is being prosecuted is not admissible to show the accused's bad character and his inclination to engage in criminal activity. *Id.* Evidence of other crimes may be admissible in certain special circumstances where it is relevant for some other legitimate reason and not to show that the accused is a person pre-disposed to commit crimes. *Id.*

There are several exceptions that this court has recognized as coming within the special circumstances and constituting legitimate reasons for admitting evidence of other crimes. Those exceptions include, without limitation:

(1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one naturally tends to prove the others; (5) to establish the identity of the person charged with the commission of the crime on trial where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other; (6) to impeach the credibility of a defendant who testifies in his trial; (7) situations where defendant's prior criminal history had been used by him to threaten or intimidate the victim; (8) situations where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development (sometimes called 'res gestae' exception).

*Commonwealth v. Billa*, 521 Pa. 168, 177, 555 A.2d 835, 840 (1989).

Michael Ferry, who was a prisoner in the Butler County Jail at the time the appellant was incarcerated there testified concerning the appellant's stated motive for killing Jeanine Revak.

Q. What were his words again Mr. Ferry?

A. He said he had to ring her neck.

Q. Did he say why he killed her?

A. He didn't want no repercussions from her. He was scared she would go to the police.

Q. Did he indicate what he thought would happen if she went to the police?

A. That he would lose everything that he had, he had been on work release.

(TT p. 382.)

The appellant argues that in most criminal cases the distinct possibility exists that the accused may be arrested upon a report by a victim and consequently lose everything. Appellant submits that the mere fact that he was on work release from a state prison "cannot imply that he had more to lose than any other accused." (Appellant's Brief, p. 23.) We do not agree with appellant's contention. As the Commonwealth points out, the appellant himself testified that:

"The status on work release is very sensitive. It's quite easy to lose it. Even with a suspicion you can lose that status. And I've worked very hard to get it."

(TT, p. 554.)

On the issue of pre-meditation, the Commonwealth called Susan Blackburn, who testified that she had made arrangements with the appellant to meet with him socially on Friday, January 10. As it turned out the appellant broke that date. Ms. Blackburn testified as follows:

Q. What was the reason he gave you that he wouldn't be able to meet you?

A. That his furlough papers through the prison had gotten fouled up and he wouldn't get the furlough.

Q. What did he mean? Why wouldn't he be able to meet you because of the problem with the furlough papers?

A. Because he would not be out of prison. He'd have to go back after the day's work.

Q. On Friday, the end of the week?

A. Right.

Q. Had you made arrangements prior to this conversation on Wednesday to meet him?

A. Yes.

Q. What my question is: You had a firm date prior to Wednesday?

A. We had—yes it was. We had planned to have dinner on the tenth and on Wednesday I called to confirm that, and it wasn't confirmed then.

Q. That's when he told you he wouldn't be able to meet you because he had to go back to prison?

A. Yes, that's correct.

(TT, pps. 362–63.) The Commonwealth argues that the admission of Susan Blackburn's testimony referring to appellant's furlough from prison was proper in that this testimony established that the appellant lied to her when he cancelled their date for Friday, January 10, 1986. Thus, the appellant's cancellation of his engagement with Susan Blackburn tended to establish that he planned to do something else that Friday which he could not reveal to Ms. Blackburn. That something else turned out to be the rape and murder of Jeanine Revak, a woman who, by his own admission, he had coveted. We find that the trial court did not abuse its discretion in admitting this testimony.

On the matter of appellant's consciousness of guilt through escape, the Commonwealth called Tony Gennaro, Record Supervisor at the Regional Correctional Institution at Greensburg, who testified that the appellant was on a work release program which entitled him to leave the prison in the morning and return in the evening after his work day. Mr. Gennaro further testified that on the weekend of January 10 through January 12, 1986, appellant had a furlough. Appellant was required to be back at the institution on Monday, January 13, 1986, at 9:00 P.M. Finally, Mr. Gennaro testified that appellant did not return as required and his absence was reported to the State Police. Appellant had admitted to one of his friends, Elizabeth Manuel, that the state police had been at his place of employment on Sunday, January 12, 1986, and apparently had made a

search of his office. Ms. Manuel advised appellant that if he had done nothing wrong, he had nothing to fear and should to talk with the police. Contrary to this advice, the appellant failed to return to the prison where he most certainly would be found by the police authorities. Rather, the appellant borrowed another friend's automobile thus keeping his own automobile off the road, did not go to work on Monday, January 13, 1986, even though he told his employer he would be there, and failed to report back to the prison as required.

The testimony that the appellant was on work release status from the regional prison in Greensburg was not introduced to show that the appellant was of bad character and inclined to commit criminal acts. In no case were the underlying crimes which led to his incarceration revealed to the jury during the guilt phase of the trial. The appellant's work release status was a significant element in the development of the circumstantial case against the appellant. It was naturally interwoven in the sequence of events leading to and following the rape and murder of Jeanine Revak. Under the circumstances, it was not error to admit evidence of appellant's work release status.

## V.

Next, appellant contends that he is entitled to a new trial because of certain improper remarks of the District Attorney. Specifically, appellant complains that after he had concluded testifying on his own behalf, and prior to cross examination, the District Attorney requested a recess to prepare for cross examination because it was the first time he had heard the story told by appellant on direct examination. Appellant states in his brief that:

"The precise remark [of the District Attorney] is unknown because the court reporter failed to take it down or failed to transcribe it. However, the lower court granted a motion to correct the transcript to include the statement, which would appear on page 555 just prior to the ten (10) minute recess."

(Brief of Appellant, p. 31.) Our detailed review of the record in this case failed to disclose the order referred to in appellant's brief.[5] Furthermore, even if there was such an order, we would be unable to review the alleged remark inasmuch as the appellant admits that "the precise remark is unknown."

The trial court, in its Memorandum Opinion, states that a remark which it considered improper was made by the District Attorney prior to cross examination. Although the trial court does not precisely quote the prosecutor, its opinion states that: "The remark was made prior to cross examination when the district attorney requested a recess because the defendant had never told anyone this story before." (Trial Court Slip Opinion, p. 5.) The trial court concluded that the remark did not involve unfair use of the appellant's right to remain silent nor did it deprive him of a fair trial.

Considering the lower court's paraphrase of the prosecutor's remark and its general tenor, we find that the remark was not improper. In his statement, given to trooper Stanek on January 13, 1986, the appellant denied having any contact with the victim on the day of her death. Trooper Stanek testified that when the appellant voluntarily gave a statement by answering the trooper's questions, he was asked when he last saw the victim. The appellant stated that it was when she was in the office with her portfolio. (TT., p. 193.) Later he was asked when was the last time he had seen or had any contact with the victim. The appellant again stated when she was in the office with her portfolio. (TT., p. 194–95.) The appellant was specifically asked: "Did you see Jeanine Revak on Friday, Janu-

5. The only order of court pertaining to appellant's objections and amended objections to the trial transcript we found in the record provides as follows:

NOW, MARCH 24, 1988, after reviewing the trial transcript and defendant's objections and amended objections, the Court dismisses the defendant's objections except for page 270 line 7 where the words "Sidebar conference" and line 18 "End of sidebar conference" are ordered to be deleted from the transcript."

BY THE COURT

ary 10, 1986." He answered "No." (TT, p. 195.) Later appellant was again asked if he saw Jeanine Revak on January 10, 1986 at any place or at any time and he replied in the negative. (TT., p. 197.) Still later he admitting telling Mr. Revak, on two occasions, that he had not seen Jeanine Revak on Friday, January 10, 1986. (TT., p. 200.) The appellant further told trooper Stanek that he had no knowledge of Jeanine Revak, that he had not seen her for a long time. He said he had not seen her other than the time she brought her portfolio to the office which was long before January 10, 1986. (TT., p. 200.) Additionally, James Revak, husband of Jeanine Revak, testified that the appellant twice had told him that he, appellant, had not seen the victim at any time on Friday, January 10, 1986. These specific denials were part of the record when appellant arose to testify in his own defense.

When the appellant took the stand, he testified contrary to the statement he had given to Trooper Stanek and stated that he and the victim, Jeanine Revak, were intimate friends. He testified that on Friday, January 10, 1986, the day she was murdered, she had come to see him at The Finishing Touch store where they engaged in consensual sexual intercourse in his office. Considering the circumstances of the district attorney's comment as paraphrased by the lower court in its memorandum opinion and by the appellant in his brief, we hold that the trial court did not abuse its discretion in ruling that appellant was not deprived of a fair trial because of the comment.[6]

▇▇ Additionally, appellant complains that when the district attorney began his cross examination of the appellant, his first question was:

Q. Mr. Tedford, I'm going to have to take some time since this is the first time you had ever told anybody that

---

**6.** We note that it is preferable that such comments are made at sidebar and out of the hearing of the jury. We are not specifically told whether the remark in this case was made in front of the jury, though we assume that it was.

you knew Jeanine, and I think you started by saying you knew Jeanine before she brought her portfolio in.

A. Yes.

(TT, p. 555.) The prosecutor's question, although inartfully framed, is the introduction to an inquiry into the inconsistency between appellant's pretrial statements and his testimony at trial. In appellant's statement given to Trooper Stanek on the night he was taken into custody, he stated that he had no knowledge of Jeanine Revak and he unequivocally denied that he saw or had contact with the victim on the day of her death. Also, on two separate occasions, (the night of January 10, 1986 and the morning of January 11, 1986) the appellant was asked by James Revak whether he had seen the victim that Friday. The appellant, on each occasion, denied seeing her. At trial, he stated that he and the victim were carrying on an affair and on January 10, 1986, she stopped at the store to have sex with him. The prosecutor had the right to inquire into this glaring inconsistency when he cross examined the appellant.

## VI.

The appellant argues that the trial court erred in failing to suppress two statements given by him, one to Trooper Stanek between 11:40 p.m. on January 13, 1986, and 1:00 a.m. on January 14, 1986, and the other given to Trooper Taylor between 9:15 a.m. and 10:00 a.m. on January 14. Since the statement given to Trooper Taylor was not offered into evidence by the Commonwealth, we need not discuss its admissibility.

The appellant, in challenging the admissability of the statement given to Trooper Stanek, relies upon the "six hour rule" established in *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977) as retroactively modified in *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987). *Davenport* held that: "If an accused is not arraigned within six hours of arrest, any statement obtained after arrest but before arraignment shall not be admissible at trial." In *Duncan*, the *Davenport* rule was modified to

provide that voluntary statements obtained in a lawful fashion within the six hour period are not in violation of the rights of the accused, and are admissible in evidence at trial even where arraignment is not within six hours of arrest.

The appellant was taken into custody at approximately 10:00 p.m. on Monday, January 13, 1986, by the Cranberry Township Police. The Cranberry Police had received an advisory from the State Police that appellant was wanted as an escapee because he had not returned to prison after his furlough. The suppression court found that at the Cranberry Police Station, at 11:40 p.m., the appellant was informed by Trooper Stanek of the State Police that he was a suspect in the homicide investigation of the death of Jeanine Revak. The appellant, after acknowledging in writing that he was advised of his *Miranda* rights and further acknowledging that he understood his rights, gave a statement to Trooper Stanek by answering various questions put to him. It was approximately five weeks later, on February 21, 1987, that the appellant was charged with the murder and rape of Jeanine Revak. Meanwhile, the appellant was held in Butler County as an escapee from the prison facility at Greensburg.

The statement given by appellant to Trooper Stanek was within six hours of being taken into custody by the Cranberry Police. The statement was voluntary, not coerced, and was taken in a lawful manner. There was no connection whatsoever between the voluntary statement given by the appellant and any delay in his arraignment. We conclude that appellant's statement, given to Trooper Stanek, was properly admitted into evidence at trial.

 Additionally appellant contends that the trial court erred in failing to suppress physical evidence belonging to him which was seized in a search of his place of employment consented to by Robert Sasso, the owner of the business and appellant's employer. Appellant argues that he had a legitimate expectation of privacy in the store office and the desk he used in that office. He argues that as the owner of personal items seized he had the expectation that

his property could not be legitimately tampered with, used or seized without *his* consent. (Appellant's brief, p. 29.)

The only items obtained in a search of The Finishing Touch and offered into evidence were: (1) a piece of paper which had written on it the name "Jim Revak" and his unlisted telephone number written; and (2) the top sheet of a desk blotter calendar with various things written on it, including the same unlisted telephone number which was also the victim's number. Both of these items were observed on and taken from the top of a desk used by the appellant and others who worked at The Finishing Touch. The suppression court found and the record supports that the office at The Finishing Touch contained two desks. Both of the desks were used by Robert Sasso the owner of the store, the store's bookkeeper, the appellant, and a part time employee. No employee had a specific desk assignment and each employee had use of both desks. Neither of the desks were ever locked, and the desk from which the items introduced into evidence were taken, contained several articles that belonged to Robert Sasso along with some personal items of the appellant. We conclude that the piece of paper and blotter calendar page were lawfully seized and properly admitted into evidence. It is firmly established that a warrantless search of property is not precluded when consent is given by a person who possess the authority to consent to a search. *Commonwealth v. Kontos,* 442 Pa. 343, 276 A.2d 830 (1971); See also *Commonwealth v. Latshaw,* 481 Pa. 298, 392 A.2d 1301 (1978); *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). There is no question that the owner of the store, Robert Sasso, possessed the authority to consent to a search of the office and desk which he jointly used with appellant and others. He had the right and authority to consent to a search of the office desks used in common with the bookkeeper, the appellant and a part-time employee, and that each of the users assumed the risk that one of them may consent to a search. *Id.*

## VII.

Next the appellant argues that he was deprived of a fair trial because of ineffective assistance of trial counsel. The appellant did not file timely post trial motions following his convictions for first degree murder and rape. After sentencing, the trial court granted appellant permission to file post verdict motions nunc pro tunc. On April 20, 1987, Motions for a new trial and/or arrest of judgment nunc pro tunc were filed by appellant through his trial counsel. On April 27, 1987, appellant, through newly appointed counsel, filed a Nunc Pro Tunc Motion for New Trial and Motion in Arrest of Judgment wherein he averred the ineffective assistance of trial counsel. His nunc pro tunc motions were "amended" and "corrected" on November 23, 1987 and again on January 4, 1988. A hearing on appellant's motion alleging, inter alia, ineffective assistance was held on February 1, 2 and 3, 1988. Following the hearing, the appellant, on February 19, 1988, filed *pro se,* further amendments and corrections to his nunc pro tunc post trial motions.

Essentially, the appellant, in his allegations of ineffective assistance of counsel, takes a "shotgun" approach and attempts to challenge every decision trial counsel made with respect to his failure to call or recall certain witnesses and the questioning of the witness who were called and did testify.

We have reviewed the entire record in this case, including the evidentiary hearing of February 1, 2 and 3, 1988 and appellant's *pro se* amended and corrected motions filed on February 19, 1988, and conclude that the claims of ineffectiveness of trial counsel raised by the appellant are meritless. We find no error in the lower court's order in dismissing all of appellant's ineffectiveness claims.

## VIII.

Finally, the appellant argues that the trial court erred in failing to *compel* the introduction of evidence of mitigating circumstances at the sentencing phase of his

trial. Appellant contends that because of this alleged error, the death sentence imposed by the jury should be vacated and his case remanded for new sentencing.

At the sentencing hearing, the appellant directed his trial counsel not to present any testimony or evidence by way of mitigating factors for the jury to consider. Immediately prior to taking of testimony at the sentencing phase, a conference in chambers was held to inform the court of appellant's instructions to his counsel. A colloquy with appellant was conducted by defense counsel wherein appellant acknowledged that he fully understood the gravity of the crimes for which he was convicted and the fact that the Commonwealth was seeking the death penalty. He acknowledged that he understood that he had the right to present evidence of mitigating factors to offset the aggravating factors the Commonwealth intended to introduce. Further, he understood that aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt as opposed to the lesser standard of proof—a preponderance of the evidence—which is the appellant's burden in proving mitigating circumstances. The appellant refused to meet with his mother and sister, who were present in court, and, along with defense counsel, attempt to prepare to introduce evidence of mitigating factors at the sentencing hearing. The appellant stated that he did not want to go through the ordeal of producing such evidence nor did he want his family to become participants in such an endeavor. The appellant stated that he was completely aware of the proceedings and their nature, and he was waiving his right to present evidence of mitigating circumstances. The jury unanimously found the aggravating circumstances of: (1) a killing committed while in the perpetration of a felony; and (2) a significant history of prior felony convictions involving the use of violence.

The appellant argues that the trial court knew that appellant's mother and sister were present in court and it had a duty to determine whether these close relatives possessed information relevant to the jury's determination of sentence. Neither the sentencing statute (42 Pa.C.S.A. § 9711)

nor case law mandates that the trial court, against the declared wishes of a defendant, attempt to marshall evidence of mitigating factors on behalf of that defendant and then present any such mitigating evidence to the jury. We decline appellant's invitation to create and impose such a duty on a trial court. The character of the proceedings, even at the sentencing phase, are adversarial and neither the Court nor the Commonwealth are required to act on behalf of the appellant and seek out evidence of mitigating factors. Pursuant to the sentencing statute, the appellant has the right to produce evidence of any kind by way of mitigation. 42 Pa.C.S.A. § 9711(e)(1–8) The trial court cannot compel him to exercise that right, nor is it obliged to exercise the right for him.[7]

7. The appellant's argument that the trial court erred in failing to compel evidence of mitigating factors was first asserted as a claim of ineffective assistance of counsel. In appellant's nunc pro tunc motion for a new trial and arrest of judgment, and his amendments thereto, appellant alleged that trial counsel was ineffective for failing to present evidence of mitigating factors at the sentencing phase of his trial. His ineffectiveness claim was made despite appellant's specific instructions to counsel not to present such evidence. Subsequently, the appellant abandoned this ineffectiveness claim and converted it to a claim that the trial court had a duty to compel the production of mitigating factors and it erred in failing to carry out that alleged duty.

As we have stated, the trial court has no duty or obligation to, *sua sponte*, compel the production of evidence of mitigating factors on behalf of a convicted defendant at a sentencing hearing. Furthermore, the appellant has failed to set forth in any of the numerous motions, petitions and miscellaneous papers he filed in this case, even one mitigating factor which could have been introduced into evidence had he permitted his attorney to do so. See *Commonwealth v. Pettus*, 492 Pa. 558, 424 A.2d 1332 (1981). In *Pettus*, we said that this Court will not consider claims of ineffective assistance of counsel in the abstract. Appellant, in the instant case, presented this claim of ineffectiveness, later converted to a claim of trial court error, entirely in the abstract. At no time did the appellant suggest an offer of proof of any mitigating factor which could have been presented. If we were to allow the kind of nonsensical argument presented by the appellant here, we would be sanctioning a "built-in" ineffective assistance of counsel claim which could be switched to a claim of trial court error by every convicted first degree murderer who simply refused to put in evidence of mitigating factors at his sentencing hearing. New trial court hearings and additional issues on appeal would then be guaranteed. This court will not permit this kind of manipulation of our system.

341

## IX.

 Pursuant to our statutory obligation, we have thoroughly reviewed the entire record of the proceedings in this case, including the sentencing hearing, and conclude that the evidence supports the finding of the aggravating circumstances found by the jury: that the appellant committed the killing while in perpetration of a felony, 42 Pa.C.S.A. § 9711(d)(6); and the appellant has a significant history of felony convictions involving the use of violence to the person,[8] 42 Pa.C.S.A. § 9711(d)(9). Further, we find that the sentence of death imposed resulted from the facts and circumstances established by the evidence and was not the product of passion, prejudice or any other arbitrary factor. 42 Pa.C.S.A. § 9711(h)(3)(i) and (ii). Additionally, we have a duty to determine whether the sentence of death in the instance case is excessive or disproportionate to the sentence imposed in similar cases. 42 Pa.C.S.A. § 9711(h)(3)(iii). In discharging that duty, we have conducted a complete examination of the data and information relating to similar cases compiled by the Administrative Office of Pennsylvania Courts (AOPC). *See Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, 707–08 (1984) cert. denied 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984) and Appendix attached thereto which forms the basis for the AOPC data. Based upon our review of that data and information in accordance with our duty, we find that the penalty of death imposed in this case is not excessive or disproportionate.

The judgment of sentence is affirmed.[9]

8. In 1973, the appellant was convicted in Allegheny County of robbery, receiving stolen goods, assault and battery and intent to ravish in separate charges involving an attack on two female victims. He was serving his sentence on those charges at the Regional Correctional Institution at Greensburg when the victim in this case, Jeanine Revak, was raped and murdered.

9. The Prothonotary of the Western District is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence, and review by the Court to the Governor. 42 Pa.C.S.A. § 9711(i).