649 A.2d 435

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Zachary WILSON, Appellant.**

Supreme Court of Pennsylvania.

Argued May 5, 1992.

Decided Nov. 9, 1994.

Reargument Denied Jan. 19, 1995.

488

George Henry Newman, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Arlene Fisk, Asst. Dist. Atty., Kathy L. Echternach, Philadelphia, for appellee.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

NIX, Chief Justice.

This is a direct appeal from a sentence of death[1] imposed by the Court of Common Pleas of Philadelphia County. Following a trial by jury, Appellant, Zachary Wilson, was convicted of first degree murder[2] and possession of an instrument of crime.[3] The jury found two aggravating circumstances[4] and no mitigating circumstances and therefore sentenced Appellant to death.

 In accordance with the standard established in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27 n. 3, 454 A.2d

1. 42 Pa.C.S. § 9711(h)(1).

2. 18 Pa.C.S. § 2502(a).

3. 18 Pa.C.S. § 907.

4. The two aggravating circumstances were that Appellant created a grave risk of death to others when he repeatedly fired at the victim in a crowded bar, 42 Pa.C.S. § 9711(d)(7); and that Appellant had a significant history of felony convictions involving the use or threat of violence, 42 Pa.C.S. § 9711(d)(9).

937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), this Court must independently review the sufficiency of the evidence which supports a first degree murder conviction regardless of whether Appellant specifically makes such a challenge. The test for determining sufficiency is whether the evidence admitted at trial, and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to establish all the elements of the offense beyond a reasonable doubt. *Commonwealth v. Carpenter,* 511 Pa. 429, 435, 515 A.2d 531, 533–34 (1986). Based upon our review of the record, we find sufficient evidence to sustain Appellant's conviction.

At approximately 1:15 p.m. on August 3, 1981, Appellant entered Marty's Sweet Joy Lounge located at Allegheny Avenue and 24th Street in the City of Philadelphia. Appellant pulled a gun from under his coat as he walked past several patrons sitting at the bar. He aimed the gun at the victim, Jamie Lamb, who was sitting at the rear of the bar. After shooting the victim four times, Appellant fled the scene. The victim subsequently died from injuries caused by multiple gunshot wounds.

A Commonwealth witness, Jeffrey Rahming, was in rear of the bar, standing just behind the victim when the shooting started. Rahming saw Appellant enter the bar, aim the gun at the victim, and shoot the gun.

A second Commonwealth witness, Edward Jackson, was sitting at the front of the bar when Appellant entered. He, as well as many other patrons, dove to the floor as the gunfire began. When Appellant rushed to leave the bar, he tripped over Jackson and fell to the floor. Jackson and Appellant came face to face before Appellant scrambled to his feet and ran out of the bar.

Jeffrey Rahming later identified Appellant in a police lineup, and as a result, Appellant was charged with first degree murder. Following a preliminary hearing in 1982, Appellant was released because both Rahming and Edward Jackson failed to identify him during the proceeding.

In 1986, charges were reinstituted against Appellant when an individual named Lawrence Gainer agreed to testify at a second preliminary hearing. The substance of Gainer's testimony was that Appellant had admitted to him that he killed Jamie Lamb because he thought Lamb was involved in the death of Appellant's cousin. In addition to Gainer's testimony, both Edward Jackson and Jeffrey Rahming gave statements indicating that they had been threatened in 1981 and 1982 to change their identifications.

At trial, Edward Jackson positively identified Appellant as the man that he saw enter the bar and shoot Jamie Lamb. N.T. 1/5/88, 49–53, 66. Jackson also testified that he purposely identified the wrong person at the 1982 police lineup because he and his family had been threatened with harm.[5] N.T. 1/5/88, 57–59. He further testified that he changed his place of residence in early 1982 out of fear that he or his family might be harmed. N.T. 1/5/88, 56–57.

Jeffrey Rahming also testified at Appellant's trial. He testified that he was standing right behind Jamie Lamb at the time that Lamb was shot. N.T. 1/5/88, 102–04. Rahming also positively identified Appellant as the perpetrator. N.T. 1/5/88, 104–05. In addition, Rahming testified that although he did not know Appellant's name, he had known Appellant all his life "by his face" and recognized him on the day that he entered the bar and shot Jamie Lamb. N.T. 1/5/88, 104–06. Rahming testified that he recognized Appellant at the preliminary hearing held in 1982, but refused to identify him as the person who shot Jamie Lamb because he was told not to be a witness and had been threatened with physical harm. N.T. 1/5/88, 108–12.

In addition to the eyewitnesses, the Commonwealth presented the testimony of Lawrence Gainer. In October of 1983, Gainer and Appellant were temporarily housed together at the Philadelphia Detention Center. Although Gainer initially did not want to get involved, he later agreed to testify in 1986

5. In 1982, lineups in Philadelphia were not conducted in a way that maintained the anonymity of the person making the identification (i.e. the participants in the lineup were able to see the person or persons looking at them). N.T. 1/5/88, 141.

after a chance encounter with an acquaintance in the Philadelphia Police Department, Officer John Fleming. N.T. 1/6/88, 34–37. At trial, Gainer testified that Appellant admitted that he killed Jamie Lamb because he thought that Lamb had killed his cousin. N.T. 1/6/88, 31.

When viewed in the light most favorable to the Commonwealth as verdict winner, the testimony of Edward Jackson, Jeffrey Rahming, and Lawrence Gainer was clearly sufficient to support Appellant's conviction for first degree murder. Having determined that the record contains sufficient evidence to convict, we now turn to Appellant's claims of ineffectiveness of trial counsel as well as his allegations of defects in the proceeding below.

## RACIAL BIAS IN JURY SELECTION

Appellant alleges that trial counsel was ineffective for failing to object to the prosecutor's use of peremptory challenges to strike black venirepersons from the jury.[6] In support of this claim, he cites *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in which the United States Supreme Court held that the use of peremptory challenges to purposefully remove prospective jurors on the basis of their race, violates the equal protection clause of the United States Constitution.

Appellant claims that the Commonwealth used between ten and twelve peremptory challenges to strike black persons from the jury. He asserts that trial counsel was ineffective for failing to object to the prosecutor's use of these peremptory challenges and for failing to request that the prosecutor state her reasons for striking prospective black jurors. Ap-

6. On November 30, 1990, this Court entered a *per curiam* Order directing the lower court to transcribe and file the notes of testimony of the *voir dire*. In that same Order, Appellant was granted permission to file a supplemental brief addressing issues concerning the *voir dire* process.

Appellant's supplemental brief contains four issues, only one of which concerns the *voir dire* process. Because the three remaining issues in the supplemental brief have been not properly raised and are meritless, we will not address them.

pellant therefore requests that the judgment of sentence be vacated and the matter be remanded for a hearing on the ineffectiveness of trial counsel.

In order to prevail on a claim of ineffective assistance of counsel, Appellant must show: the claim is of arguable merit; there was no reasonable basis for counsel's actions; and that those actions prejudicially affected the outcome of his case. *Commonwealth v. Pierce*, 515 Pa. 153, 158–59, 527 A.2d 973, 975 (1987). There is a presumption that trial counsel was effective, and Appellant bears the burden of establishing counsel's ineffectiveness. *Commonwealth v. Miller*, 494 Pa. 229, 233, 431 A.2d 233, 234–35 (1981). In addition, counsel cannot be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Pettus*, 492 Pa. 558, 563, 424 A.2d 1332, 1335 (1981).

In analyzing Appellant's ineffectiveness claim, we must first determine whether there is merit to the assertion that trial counsel should have objected and required the district attorney to provide race-neutral reasons for her use of peremptory challenges to strike black venirepersons from the jury. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court set forth the standard for making a *prima facie* showing of purposeful discrimination in the jury selection process. *Id.* at 96, 106 S.Ct. at 1722–23, 90 L.Ed.2d at 87–88. First, the defendant must show that he is a member of a cognizable racial group and that the prosecutor exercised peremptory challenges to remove prospective jurors of the same racial group. *Id.* at 96, 106 S.Ct. at 1722–23, 90 L.Ed.2d at 87. Second, the defendant may rely upon the fact that the use of peremptory challenges constitutes a practice that allows " 'those to discriminate who are of a mind to discriminate.' " *Id.* (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892–93, 97 L.Ed. 1244, 1247 (1953)). Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor exercised peremptory challenges to ex-

clude prospective jurors on the basis of their race. *Id.* 476 U.S. at 96, 106 S.Ct. at 1722–23, 90 L.Ed.2d at 87–88.

■ Once the defendant makes a prima facie showing, the burden shifts to the prosecution to provide a race-neutral explanation for challenging the jurors in question. *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. The Supreme Court emphasized that

> the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race.

*Id.* (citations omitted).

In the instant case, the issue of the prosecutor's alleged discriminatory use of peremptory challenges was not raised during *voir dire* or post-trial motions and must therefore be raised collaterally through an ineffective assistance of counsel claim. The incompleteness of the record in this case is underscored by the fact that "[t]rial counsel did not establish a record of the composition of the jury, nor the race of the persons struck by the Commonwealth." Supplemental Brief for Appellant at 7 n. 1. Moreover, Appellant fails to identify which jurors were the object of the prosecutor's alleged discriminatory jury selection practice.

■ In cases where a *Batson* challenge is raised on appeal and the issue is not properly preserved for review, this Court will engage in a *post hoc* review of the record to determine whether there is a *prima facie* showing of improper use of peremptory challenges by the prosecutor. *See Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846 (1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990); *Commonwealth v. Hardcastle,* 519 Pa. 236, 546 A.2d 1101 (1988), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990). Applying the first part of the *Batson* analysis, it is clear that Appellant is a member of a cognizable racial

group and that the prosecutor exercised peremptory challenges to strike members of the same racial group from the jury.[7] Further, Appellant can "rely on the fact ... that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson v. Kentucky,* 476 U.S. at 96, 106 S.Ct. at 1722–23, 90 L.Ed.2d at 87 (quoting *Avery v. Georgia,* 345 U.S. 559, 562, 73 S.Ct. 891, 892–93, 97 L.Ed. 1244, 1247 (1953)). Finally, Appellant must demonstrate how these facts and any other relevant circumstances raise an inference that the prosecutor exercised her peremptory challenges to exclude black persons from the jury on account of their race. We have previously defined "relevant circumstances" that might support or refute such an inference to include "a 'pattern' (or not) of strikes against black jurors, and the prosecutor's questions and comments during *voir dire.*" *Commonwealth v. Abu–Jamal,* 521 Pa. at 197, 555 A.2d at 850.

▇▇▇▇▇ As evidence of racial discrimination, Appellant submits that the jury who sat in his case was comprised of nine white persons and three black persons.[8] However,

mere disparity of number in the racial make-up of the jury, though relevant, is inadequate to establish a prima facie case. The ultimate composition of the jury is affected not only by the prosecutor's use of peremptories, but by the defendant's use of such, by challenges for cause ..., and by jurors' inability to serve for personal reasons.

*Id.* In the instant case, the prosecution exercised seventeen of twenty peremptory challenges while the defense used all twenty of its peremptory challenges. In addition, thirty-five

**7.** The record in this case does not identify the race of any venireperson who was chosen, excused for cause or by agreement, or peremptorily challenged. However, for purposes of this analysis, we will accept Appellant's assertion that there were black persons included among the seventeen venirepersons peremptorily challenged by the prosecutor.

**8.** As previously noted, the record does not identify the race of any person who sat on the jury; however, Appellant's counsel submits that, to the best of his ability, he was able to determine that the jury was comprised of the racial composition indicated above. Supplemental Brief for Appellant at 8 n. 2.

venirepersons were excused for cause or by agreement of the parties. Thus, without additional support, Appellant's claim that the prosecutor used between ten and twelve peremptory challenges to exclude black persons from the jury is insufficient to establish a pattern of strikes against prospective black jurors. Moreover, our review of the prosecutor's questions and comments during *voir dire*, as well as those of Appellant's trial counsel, fails to identify any support for the claim that the prosecutor's use of peremptory challenges was racially motivated. Accordingly, we find that Appellant has not met his burden of establishing a *prima facie* showing of discrimination and, therefore, this claim of ineffectiveness of counsel must fail.

## SUPPRESSION OF IN–COURT IDENTIFICATION

Appellant next claims that trial counsel was ineffective for failing to object to an in-court identification by an eyewitness and for failing to request a suppression hearing after counsel learned that the witness had seen Appellant in the courtroom several days before making an identification. In advancing this argument, Appellant claims "that the prosecutor staged an identifying confrontation between the witness and appellant by calling the witness to the courtroom to view [him] and thus assure a subsequent trial identification." Brief for Appellant at 17. Because this "identification" occurred without appropriate safeguards or the knowledge of defense counsel, Appellant contends that his sixth amendment right to counsel was violated.

▮▮ The fact that the witness saw Appellant several days before trial first came to light during the cross-examination of the Commonwealth's witness, Edward Jackson:

By Mr. Triagiani (defense counsel):

Q. And you have identified—strike that. When is the next time you saw the accused in this case?

A. Since the lineup?

Q. Yes.

A. When I came to court the other day.

Q. You came to court the other day?

A. Yes.

. . . .

Q. Why were you coming to court?

A. I had to see the D.A., the D.A. wanted to see me.

Q. And that's when you saw the defendant?

A. Yes.

N.T. 1/5/88, 87–88. Based upon this exchange, we find Appellant's allegation of prosecutorial misconduct to be completely unsupported by the record. Jackson did not testify that the prosecutor called him to the courtroom to view Appellant, nor are we willing to infer from the record that such a result was intended from the prosecutor's request to see the witness on the day in question. Appellant has therefore failed to show that the encounter between Edward Jackson and himself was anything more than a spontaneous and unintended occurrence. Furthermore, we find no merit to the substance of Appellant's claim that Jackson's identification of him at trial was the result of having viewed him in unduly suggestive circumstances.

This Court recently reaffirmed the standard that is applied in circumstances where a suggestive identification of the accused takes place prior to trial. We stated that

[t]he problem with an impermissible suggestive identification is the potential for misidentification, resulting in a due process violation if that identification is admitted at trial. Following a suggestive pre-trial identification, a witness will not be permitted to make an in-court identification unless the prosecution establishes by clear and convincing evidence that the identification was not induced by events occurring between the time of the crime and the in-court identification. Thus, an in-court identification following a suggestive out of court identification will be admissible only if, considering the totality of the circumstances, it is determined that the in-court identification had an origin sufficiently distinguishable to be purged of the primary taint.

In determining whether an independent basis for identification exists, we must consider the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Our scope of review limits our consideration to a determination of whether sufficient evidence has been presented to support the independent basis for the in-court identification.

*Commonwealth v. Carter*, 537 Pa. 233, 253, 643 A.2d 61, 71 (1994) (citations omitted).

■ Based upon the foregoing factors and our review of the record, we are satisfied that Edward Jackson's in-court identification of Appellant had a sufficient basis independent of any possible taint that may have resulted from his inadvertent pre-trial encounter with Appellant.

Edward Jackson testified that he saw Appellant walk into the bar, pull a gun from his jacket, and begin shooting. N.T. 1/5/88, 49–51. He then fell to the floor in order to get away from Appellant. N.T. 1/5/88, 51. Jackson further testified that, as Appellant attempted to flee the murder scene, Appellant tripped over him and landed on the floor next to him. *Id.* This provided Jackson with an opportunity to "look[ ] [Appellant] dead in his face" from a distance of one-half of a body-length. N.T. 1/5/88, 52–53. The immediacy of Jackson's encounter with Appellant is evidenced by Jackson's plea for his life while the two were laying on the floor. Jackson told Appellant, "I had nothing to do with it ... go ahead, I got nothing to do with it." N.T. 1/5/88, 51. Further, the degree of Jackson's attention during this encounter is apparent from his response on cross-examination: "You do not forget when a person is lying on the floor and you have a gun in your face, you do not forget that picture." N.T. 1/5/88, 69.

On the day of the murder, Edward Jackson gave the police a detailed description of the person that he saw shoot Jamie

Lamb. He described the perpetrator as "five-eight and around 150 to 165 pound [sic]; dark to medium complexion; clean shaven; 23 to 24; wore a black hat with a brim that was pulled all the way down." N.T. 1/5/88, 73. Although Jackson indicated in his statement that the lighting in the bar "wasn't that good," he qualified his description by stating that Appellant "was close enough for me to see him good." N.T. 1/5/88, 73–74. When asked by a police officer on the day of the shooting whether he would know the man if he saw him again, Jackson answered "yes, definitely." N.T. 1/5/88, 93. In addition, Edward Jackson testified that he had no doubt in his mind that Appellant was the man that he saw shoot Jamie Lamb. N.T. 1/5/88, 91.

Finally, we must address the amount of time which lapsed between the crime and Edward Jackson's in-court identification of Appellant. The murder of Jamie Lamb occurred on August 3, 1981, and Jackson identified Appellant as the man who committed the murder on January 5, 1988. Although a time period of six and one-half years tends to cast doubt on the ability of a witness to accurately recall the identity of a person, we find that, based on the totality of the circumstances, the record is sufficient to establish an independent basis for Edward Jackson's in-court identification of Appellant.[9] Accordingly, we reject Appellant's claim that counsel was ineffective for failing to object to the in-court identification and failing to request a suppression hearing.

## DEPRIVATION OF RIGHT TO CONFRONTATION

Appellant alleges that a ruling by the trial court impermissibly curtailed the cross-examination of Commonwealth witness Edward Jackson and deprived Appellant of his Sixth Amend-

9. We are mindful of the fact that Edward Jackson failed to identify Appellant in a police lineup conducted in March of 1982. As indicated previously, Jackson testified that he was threatened with bodily harm and, therefore, intentionally identified the wrong person and told police that he was not certain who had committed the shooting. N.T. 1/5/88, 56–60. Jackson later testified that he had, in fact, seen Appellant in the lineup and recognized him as the person who shot Jamie Lamb seven months earlier. N.T. 1/5/88, 57–60, 63–65.

ment right to confrontation. He further contends that trial counsel was ineffective for failing to object to the court's ruling and for not articulating the proper basis for his questioning. Appellant's claim is based on the following exchange:

By Mr. Triagiani (defense counsel):

Q. When you first saw the individual—all right? What specific characteristics can you tell this jury today that that individual had?

Ms. Fisk (assistant district attorney): Objection, Your Honor.

By Mr. Triagiani:

Q. Physical Characteristics

Ms. Fisk: Objection.

The Court: I think [Edward Jackson] has already answered that question. Counselor, you have gone through that on his statement.

Mr. Triagiani: I have nothing further.

N.T. 1/5/88, 90. Appellant submits that the trial court denied his right of confrontation by precluding "any inquiry as to [Jackson's] perceptions and memory of the perpetrator at the time of the shooting." Brief for Appellant at 26. Additionally, Appellant claims that trial counsel should have argued that his questions were not directed toward what Jackson told the police in his written statement, but rather were aimed at reviewing Jackson's recollection of the scene of the crime at the time of the incident.

Edward Jackson's testimony on direct examination recounted his observations on the day of the shooting, the events that transpired afterward, and the reason for his intentional failure to identify Appellant in a police lineup. On cross-examination, Jackson testified as to how Appellant's appearance had changed since the time of the shooting; specifically, that Appellant had lost weight and grown a mustache. N.T. 1/5/88, 88. After questioning Jackson's recollection of the perpetrator's lack of facial hair and the description that he gave to the police, counsel attempted to have Jackson again state the perpetrator's specific physical characteristics.

The scope and manner of cross-examination are within the discretion of the trial judge, whose decision will not be reversed absent an abuse of discretion or error of law. *Commonwealth v. Sisco*, 484 Pa. 85, 88, 398 A.2d 955, 957 (1979). Based upon our review of Edward Jackson's testimony on direct and cross-examination, we find that the trial judge did not abuse his discretion in sustaining the assistant district attorney's objection to trial counsel's repetitive questioning. Accordingly, this claim of error must be rejected.

## INTRODUCTION OF OTHER CRIMES EVIDENCE

[17] Appellant next argues that the introduction of other crimes evidence deprived him of a fair trial and that counsel was ineffective for failing to object to the introduction of such evidence. The evidence in question was testimony elicited during direct examination of the Commonwealth's witness, Lawrence Gainer. Gainer testified that he was in the Philadelphia Detention Center on October 2, 1983, and while there, saw and conversed with Appellant. N.T. 1/6/88, 28–30. During the course of that meeting, Gainer testified that Appellant admitted killing Jamie Lamb because he thought that Lamb had killed his cousin. N.T. 1/6/88, 31. Appellant argues that the jury knew that his incarceration at the Philadelphia Detention Center was for criminal conduct other than that for which he was on trial. However, our review of the record does not support the assertion that the jury was able to conclude that Appellant's presence in the Philadelphia Detention on October 2, 1983, was the result of a separate, unrelated criminal act.

On March 31, 1982, one of the eyewitnesses to the shooting, Jeffrey Rahming, selected Appellant from a police lineup as the person that he saw shoot Jamie Lamb. Sometime thereafter, the first preliminary hearing was conducted.[10] Appellant

10. There are no notes of testimony from this preliminary hearing and the record does not contain the precise date when it occurred. Appellant's counsel submits, however, that the first preliminary hearing took place on May 27, 1982. Brief for Appellant at 6.

The record is devoid of any reference to the fact that Appellant was discharged following this hearing and that charges were subsequently reinstituted in 1986.

had, therefore, been arrested and detained in 1982, and the jury could reasonably infer that Appellant's incarceration in 1983 was due to this fact.

Furthermore, the substance of the conversation between Appellant and Lawrence Gainer in the Philadelphia Detention Center lends support to the inference that Appellant was being held for the murder of Jamie Lamb. Appellant's culpability for the murder of Lamb was the primary focus of the dialogue between the two, and no other reference to any type of criminal activity was brought to the jury's attention. N.T. 1/6/88, 30–31. Thus, the testimonial evidence in question "did not either expressly or by reasonable implication convey the fact of a prior criminal offense unrelated to the criminal episode for which [Appellant] was then on trial." *Commonwealth v. Stoltzfus,* 462 Pa. 43, 60, 337 A.2d 873, 881 (1975). Accordingly, we must reject Appellant's claim that he was prejudiced by the introduction of other crimes evidence and that counsel was ineffective for failing to object to that evidence.

## POLICE REFERENCE TO APPELLANT AS THE "PRIME SUSPECT"

■ Appellant next alleges that trial counsel was ineffective for failing to object when Philadelphia Police Detective William Wynn referred to him as the "prime suspect" in the 1982 police lineup. Appellant claims that this statement was an improper expression of Detective Wynn's personal opinion that he was guilty and that there was evidence to support that belief. We find this claim to be meritless.

Our review of the record reveals that Detective Wynn's comment was the result of his attempt to familiarize the jury with the procedures used in assembling a police lineup. Detective Wynn stated that the police "refer to the prime suspect in a case as the 'prime' or 'prime suspect,' and the five additional men that participate in a lineup with him are referred to as 'fill-ins.' " N.T. 1/5/88, 128. He subsequently testified that "[t]here was a lineup conducted ... where Zachary Wilson was the prime suspect." N.T. 1/5/88, 130.

We reject Appellant's attempt to characterize this statement as Detective Wynn's personal belief of Appellant's guilt and find that it was properly admissible to explain the method of arranging the lineup. Furthermore, the reference to Appellant as the "prime suspect" could not have been prejudicial because it did nothing more than reiterate to the jury the obvious fact that Appellant was charged and being tried for the murder of Jamie Lamb because it was believed that he was the perpetrator. Thus, we conclude that Appellant's argument is meritless and must be rejected.

## APPELLANT'S REMOVAL FROM THE COURTROOM

Appellant next argues that the trial court erroneously removed him from the courtroom and that trial counsel was ineffective for failing to ensure his continued presence throughout the trial. The record indicates that Appellant was present during the entire first day of trial, during which Commonwealth eyewitnesses Edward Jackson and Jeffrey Rahming testified. On the following day, Appellant was present during the direct examination of Lawrence Gainer. During the cross-examination of Gainer, the following exchange took place:

By Mr. Triagiani (defense counsel):

Q. Well, what were his words to you? What were his exact words to you?

A. Like I said, he was saying a lot of stuff. He was even saying, "Man, you do this I am going to be in the courtroom crying. Don't do this to me, man.["]

The defendant: Why you doing this, man?

The witness: It's the truth. Cry now.

The defendant: I ain't telling you—

The court crier: Everyone remain seated while the jury leaves the room.

The defendant: I'm not sitting down, man. I don't want to sit down, man. What did I ever do to you, man?

The witness: You heard me. You told me the truth.

Ms. Fisk: Wait until the—

The court: Look, you are only hurting yourself.

The defendant: I don't want to be in here no more. I want to be out of here, man. You all are doing—what are you doing, boy? Take me out, man. Take me out, man.

The court: You want to talk to him?

Ms. Fisk: No.

The court: Let the record indicate that I have directed the defense attorney to talk to him. The defendant wants to be removed from the courtroom and if that's his wish, that's all right with me. But I want the attorney to talk to him first. This is a result of an outburst by the defendant himself.

N.T. 1/6/88, 65–66. Immediately after Appellant's outburst, a recess was taken.[11]

We disagree with the premise of Appellant's argument that the trial court removed him from the courtroom. To the contrary, the record clearly shows that Appellant's decision to leave the courtroom was made voluntarily. The court called a recess and specifically directed that defense counsel consult with Appellant before he made any decision to remain or leave the courtroom. We therefore reject Appellant's contention that the trial court erroneously and involuntarily removed him from the proceedings.

Additionally, Appellant has failed to allege any basis upon which trial counsel's actions can be deemed deficient. He has not claimed that his decision to leave was the result of poor advice by counsel or that he did not understand the consequences of that decision. Finally, we note that Appellant has not alleged that he was in any way prejudiced by his absence from the courtroom.[12] Thus, we conclude that Appellant's claim of ineffectiveness of counsel must fail.

11. Appellant submits that, although the record does not expressly indicate that he was removed, he makes an offer of proof that he was in fact "escorted" from the courtroom and testimony continued in his absence. For purposes of this analysis, we will infer from the record that Appellant was removed at this point in the proceedings.

12. Following Appellant's departure from the courtroom, defense counsel finished his cross-examination of Lawrence Gainer (consisting of

510

Appellant additionally complains about another portion of the proceeding in which he was absent from the courtroom. During the penalty phase, Appellant interrupted defense counsel's closing argument and requested that he be allowed to leave. N.T. 1/11/88, 28. The jury was promptly escorted from the courtroom and a discussion between the court, the prosecutor, defense counsel, and Appellant followed. Appellant repeated his request to leave and the prosecutor emphatically voiced her objection to that request. N.T. 1/11/88, 29–30. After consulting with defense counsel and receiving admonishments from the court that he was "making a big mistake," Appellant chose to leave the courtroom. N.T. 1/11/88, 29–32. Appellant indicated that he was "positive" that he did not want to remain in the courtroom and that the decision was made of his own free will. N.T. 1/11/88, 29, 31. The trial judge indicated for the record that he believed Appellant's decision to leave was made voluntarily. N.T. 1/11/88, 31. Additionally, defense counsel stated that he advised Appellant to remain in the courtroom, but Appellant refused to stay. N.T. 1/11/88, 32. When the members of the jury returned to the courtroom, the judge advised them that Appellant voluntarily chose not remain and that they should not hold that against him when they decided the appropriate penalty. N.T. 1/11/88, 32–33.

▬ Based upon the foregoing, we are amply satisfied that Appellant made a knowing and voluntary waiver of his right to be present during the closing arguments of the penalty phase. Appellant left the courtroom over the objection of the prosecutor, and the advice of the court as well as his own attorney. Consequently, he can not now be heard to complain that he

two pages of notes of testimony). The Commonwealth then called Linda Blakeney who testified that she received a phone call from Appellant two months prior to trial. N.T. 1/6/88, 70–75. The court then took a recess for lunch. After lunch, the Commonwealth presented, without any breaks, the testimony of Commonwealth witnesses John Brook and Officer John Fleming. The record shows that Officer Fleming "indicated" twice during his testimony when he referred to Appellant. N.T. 1/6/88, 86, 91. Based on this testimony, there exists a strong inference in the record that Appellant was present in the courtroom from the time of the lunch recess forward.

was erroneously deprived of his right to be present at the penalty phase of the trial.

## AFTER–DISCOVERED EVIDENCE

 Appellant next claims that he is entitled to a remand for an evidentiary hearing based upon a post-trial statement made by Commonwealth witness Jeffrey Rahming.[13] In an unsworn, handwritten statement appended to Appellant's brief, Rahming claims that: he did not see Appellant in the bar at the time of the shooting; the police threatened him into choosing Appellant's picture from an unspecified photo array; he identified Appellant at the 1982 police lineup after a detective asked whether he saw Zachary Wilson; Appellant did not threaten to kill him if he testified; the assistant district attorney paid him fifty dollars to sign his statement; and he refused to identify Appellant at the preliminary hearing because he was unsure of the identity of the person who shot Jamie Lamb and did not want to send the wrong person to jail.

> After-discovered evidence can be the basis for a new trial if it: 1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; 2) is not merely corroborative or cumulative; 3) will not be used solely to impeach the credibility of a witness; and 4) is of such a nature and character that a different verdict will likely result if a new trial is granted.

*Commonwealth v. Williams*, 537 Pa. 1, 25, 640 A.2d 1251, 1263 (1994) (citation omitted). Based upon this standard, Appellant's claim must fail.

**13.** It is well-established that an appellate court will only consider facts that appear in the record. *See, Commonwealth v. Young*, 456 Pa. 102, 114–15, 317 A.2d 258, 264–65 (1974) (citing cases). In the instant case, Appellant has attached to his brief what is purported to be a post-trial statement by a Commonwealth witness. Brief for Appellant, R1–R3. Such a statement is clearly not part of the record; however, we will address its substance for the limited purpose of determining whether an evidentiary hearing is warranted.

Appellant has not shown that the evidence on which he bases his claim could not have been obtained at, or prior to, the conclusion of trial. Jeffrey Rahming gave sworn testimony at Appellant's trial relating to the subjects which are contained in the unsworn statement appended to Appellant's brief. These subjects were fully explored by both sides during direct and cross-examination. Thus, there is nothing contained in Rahming's unsworn statement that was not or could not have been elicited at trial while Rahming testified under oath.

Additionally, the "after-discovered" evidence offered by Appellant is not of a nature and character that would likely result in a different verdict if a new trial were granted. When considering the post-trial statement of Jeffrey Rahming, we are mindful that "[t]here is no less reliable form of proof [than recantation], especially when it involves an admission of perjury." *Commonwealth v. Anderson,* 466 Pa. 339, 342, 353 A.2d 384, 386 (1976) (citations omitted). Here, Rahming's post-trial statement directly contradicts his sworn testimony at trial which amounts to an admission of perjury. All the other evidence presented at trial by the Commonwealth, together with Rahming's admission of perjury, would most likely result in a verdict of first degree murder. Accordingly, Appellant's request for an evidentiary hearing based on after-discovered evidence must be denied.

## ALLEGED ERRORS RELATING TO MITIGATING EVIDENCE

During the penalty phase, the only mitigating evidence presented was the testimony of Appellant who stated in essence that he was twenty-five years old at the time of the crime and that he did not kill Jamie Lamb, but wished he had because Lamb killed his adopted brother. N.T. 1/11/88, 19–21. Appellant argues that trial counsel was ineffective for failing to present evidence that Appellant believed that Jamie Lamb had killed his adopted brother and was therefore acting under

"extreme mental or emotional disturbance." [14] Appellant also contends that counsel should have requested that the court instruct the jury that it must consider Appellant's emotional disturbance as a mitigating factor.

Prior to the commencement of the penalty phase, the trial judge conducted an in chambers conference with both sides present and specifically went through each of the eight mitigating circumstances in 42 Pa.C.S. § 9711(e). N.T. 1/11/88, 7–9. When the mitigating circumstance of extreme mental or emotional disturbance was reached, the trial judge asked defense counsel whether there were any psychiatrists who could testify on Appellant's behalf. N.T. 1/11/88, 7. Defense counsel indicated that there were not and informed the court that the only mitigating evidence Appellant wished to present was his own testimony. N.T. 1/11/88, 7–9.

Following the in chambers conference, Appellant was told by his attorney, at the trial court's direction, that he had the right to call anyone that he wanted to testify in order to mitigate against a death sentence. N.T. 1/11/88, 10. Appellant stated that he did not want to call any witnesses and that he would testify on his own behalf. *Id.* at 10–11. The trial court then informed Appellant:

> [I]f you want to bring up anything in your life that happened to you during the course of your life that you think would come under number 8 of the mitigating circumstances [42 Pa.C.S. § 9711(e)(8) ], which says any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense. So if there is anything that you want to bring up, you could bring it up yourself when you take the stand, if you wish.

14. Appellant submits that he acted "under 'extreme mental or emotional disturbance' or under 'extreme duress.' " Brief for Appellant at 59. In making this argument, Appellant erroneously equates duress with mental or emotional disturbance. Duress is a defense whereby an actor may claim that he was coerced to engage in unlawful conduct by the use, or threat of use, of unlawful force against his person. *See* 18 Pa.C.S. § 309. In the instant case, there is no evidence, nor does Appellant claim, that he was coerced to kill the victim.

N.T. 1/11/88, 11. Following this instruction, the court granted Appellant's request for a recess so that he and defense counsel could further discuss his options. N.T. 1/11/88, 11–12. Thereafter, the only evidence presented at the penalty phase of the trial was that of Appellant's own testimony.

In arguing his claim of ineffectiveness, Appellant has not identified what evidence of mitigation defense counsel should have presented, nor has he alleged that any such evidence was available. In *Commonwealth v. Tedford*, 523 Pa. 305, 567 A.2d 610 (1989), this Court expressly reaffirmed its refusal to consider abstract claims of ineffectiveness such as where a defendant fails to suggest an offer of proof of any mitigating factor which could have been presented. *Id.* at 340 n. 7, 567 A.2d at 627 n. 7. Because Appellant has done nothing more than make an abstract allegation in the instant case, this claim of ineffectiveness must fail.

Additionally, we find no merit to the claim that counsel was ineffective for failing to request that the jury be charged on the additional mitigating circumstances of acting under extreme mental or emotional disturbance and acting under extreme duress. The record indicates that in his charge to the jury, the trial judge recited all the mitigating circumstances set forth in 42 Pa.C.S. § 9711(e). N.T. 1/11/88, 47–49. The jury was therefore free to consider any of the mitigating circumstances based upon the evidence presented. Given the fact that Appellant continued to pursue a strategy of denial during the penalty phase, it is not surprising that the jury did not find the mitigating circumstances that Appellant now complains should have been charged. Accordingly, this claim of error must be rejected.

In a related argument, Appellant claims that the trial court improperly restricted the jury's consideration of mitigating evidence during the penalty phase and that trial counsel was ineffective for failing to object to the charge. In support of this contention, Appellant submits that the trial judge instructed the jury that Appellant was asking them to consider

"only two" of the enumerated mitigating circumstances, age and other evidence of mitigation.

As noted previously, the jury was read the complete list of statutory mitigating circumstances to consider in its deliberations. In doing so, the trial judge told the jury that Appellant was asking them to consider two specific mitigating circumstances. This does not, however, equate to an instruction by the court limiting the jury's consideration to only those two circumstances. It would be completely unreasonable to presume that the jury would limit its determination to two choices after the court enumerated the entire list of mitigating circumstances.

Furthermore, defense counsel specifically asked the jury to consider "other evidence of mitigation." This request was designed to have the jury consider that Appellant believed that the victim, Jamie Lamb, was responsible for the murder of his adopted brother. The jury unanimously rejected this evidence as the basis for a mitigating circumstance. It is therefore highly unlikely that the jury would have found a different mitigating circumstance based upon the same theory. Accordingly, because Appellant has failed to assert any meritorious basis for relief, this claim must be denied.

### ALLEGED ERRORS IN JURY INSTRUCTIONS DURING PENALTY PHASE

Appellant raises three separate allegations of error concerning the instructions given to the jury during the penalty phase of the trial. We note initially that our scope of review when reviewing a claim that the trial court erred in instructing the jury is whether the court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. *Williams v. Philadelphia Transp. Co.*, 415 Pa. 370, 371, 203 A.2d 665, 667 (1964). This Court will consider the jury instructions in their entirety against the background of evidence in the case to determine whether error was made and whether it was prejudicial. *Reilly by Reilly v. Southeastern Pennsylvania Transp. Auth.*, 507 Pa.

204, 231, 489 A.2d 1291, 1305 (1985). Further, we will not consider isolated portions of the court's instructions to the jury that are taken out of context. *Id.*

Appellant first claims that the trial court erred in instructing the jury that its verdict with regard to the penalty must be unanimous and that counsel was ineffective for failing to object to this instruction. The portion of the jury instructions to which Appellant takes exception is the following:

> Now, the verdict is for you, members of the jury. Remember that you are not merely recommending a punishment. The verdict you return will actually fix the punishment at death or life imprisonment. Remember again that your verdict must be unanimous. It cannot be reached by a majority vote or by any percentage; it must be the verdict of each and every one of you. Remember that your verdict must be a sentence of death if you unanimously find at least one or more aggravating circumstances and no mitigating circumstances, or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances. In all other cases, your verdict must be a sentence of life imprisonment.

N.T. 1/11/88, 49–50. Appellant argues that the defect in these instructions is the fact that the jury was not told that unanimity was not required in finding mitigating circumstances.[15] The effect of this omission, Appellant claims, is that the jurors were precluded from individually determining what they believed to be the mitigating circumstances established by the evidence.

In *Commonwealth v. Edwards*, 521 Pa. 134, 555 A.2d 818 (1989), we considered the validity of language in a jury in-

15. Appellant also argues that the court's instruction violated *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), in that the instruction could have led the jury to believe that it had to be unanimous in its finding of a mitigating circumstance. However, as Appellant himself concedes, this Court has repeatedly considered and rejected this claim. *See, e.g., Commonwealth v. Williams*, 524 Pa. 218, 570 A.2d 75 (1990); *Commonwealth v. O'Shea*, 523 Pa. 384, 567 A.2d 1023 (1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990); *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27, *cert. denied*, 494 U.S. 1038, 110 S.Ct. 1500, 108 L.Ed.2d 635 (1990).

struction that was identical to the language at issue in the instant case. We concluded that the instruction was in accordance with the relevant provisions of the death penalty statute that governed jury instructions and that the language did not serve to confuse jurors regarding the unanimity of their determination. *Id.* at 161–62, 555 A.2d at 832. Because Appellant has not offered any reason why we should depart from our established precedent, this claim must be rejected.

Appellant next argues that the trial court's instructions as to how the jury should weigh aggravating and mitigating circumstances violated due process and that trial counsel was ineffective for failing to object to those instructions.[16] Specifically, Appellant complains that the trial court indirectly encouraged the jurors to use a quantitative, rather than qualitative, analysis in rendering a penalty phase verdict. This argument fails for several reasons.

First, Appellant's argument is premised on his prior erroneous claim that the jury could have believed that the finding of mitigating circumstances required unanimity. Second, our review of the record satisfies us that the trial judge was careful to emphasize to the jurors that they consider the seriousness and importance of the aggravating and mitigating circumstances rather than the quantity of those circumstances. N.T. 1/11/88, 49–54. Finally, the jury found no mitigating circumstances in this case and therefore never undertook the process of weighing aggravating against mitigating circumstances. Accordingly, this claim must also be rejected as meritless.

Appellant's final argument relating to the penalty phase jury instructions is that the trial court erred by improperly defining "preponderance of the evidence" and failing to define "beyond a reasonable doubt." Appellant also asserts that trial

**16.** Appellant also asserts that it was improper for the trial court to read the definition of all the aggravating circumstances defined by statute and to provide the jury with a written list of those circumstances. Once again, Appellant raises an argument while simultaneously acknowledging that this Court has already rejected such a claim.

counsel was ineffective for failing to object to these errors. The relevant portion of the court's instruction is as follows:

The Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. The defendant has the burden of proving mitigating circumstances, but only by a preponderance of the evidence. That is a lesser burden of proof than beyond a reasonable doubt. A preponderance of the evidence exists where one side is more believable than the other side. All the evidence from both sides, including the evidence that you heard earlier during the trial-in-chief, as to aggravating and mitigating circumstances, is important and proper for you to consider.

N.T. 1/11/88, 49. Appellant claims that the jury could have interpreted the court's instruction as "a directive to determine whether the evidence of mitigating circumstances was 'more believable' than the evidence as to aggravating circumstances presented by the Commonwealth...." Brief for Appellant at 72. Thus, Appellant's contention is that the jury would not find any mitigating circumstances simply because it concluded that the Commonwealth's evidence as to aggravating circumstances was "more believable" than the defense evidence as to mitigating circumstances. We disagree.

 Our review of the record satisfies us that the trial court's instructions in this case, when taken as a whole, accurately and correctly convey to the jury its task of determining and weighing aggravating and mitigating circumstances. The court instructed the jury that mitigating circumstances need only be proven by a preponderance of the evidence and that a preponderance exists when one side is more believable than the other. N.T. 1/11/88, 49. In *Sweeney v. Urban Redevelopment Auth.*, 427 Pa. 367, 235 A.2d 143 (1967), this Court upheld the validity of a similar instruction which stated that the "fair weight or preponderance of the evidence means evidence which weighted against that which is opposed, has more convincing force so that the greater probability of truth lies therein." *Id.* at 369, 235 A.2d at 144. Although the definition in the instant case is arguably terse, we find that it sufficiently conveyed to the jury the proper

meaning of preponderance of the evidence when viewed in conjunction with the rest of the instructions.

We are also satisfied that the jury was properly instructed as to the determination of mitigating and aggravating circumstances. After explaining the distinction between a qualitative and quantitative assessment of circumstances, the court told the jury that if it found both aggravating and mitigating circumstances, "[it] must then begin to weigh whether or not aggravating outweighs the mitigating, whether they are more serious than the mitigating or whether the mitigating are more important than the aggravating and, therefore, the mitigating outweigh the aggravating." N.T. 1/11/88, 53. Because we find that the jury was properly instructed on how to weigh the various circumstances, Appellant's allegation of error must fail.

Appellant additionally claims that the trial court failed to provide the jury with any definition of "reasonable doubt" during the penalty phase thereby leaving the jury without any guidance as to the Commonwealth's burden of proof. This argument is meritless. The trial court gave a thorough and accurate definition of the reasonable doubt standard at the conclusion of the guilt phase of the proceedings. N.T. 1/7/88, 87–89. There has been no allegation that this definition was in any way misleading or deficient. Therefore, the jury could have applied this same definition of reasonable doubt if there was any uncertainty as to the Commonwealth's burden of proof during the penalty phase. Thus, this claim must be rejected.

## STATUTORY REVIEW OF DEATH SENTENCE

After reviewing the record in this case, we find that the sentence imposed by the jury was not the product of passion, prejudice, or any other arbitrary factor. Further, the record supports the jury's finding of the aggravating circumstances specified in 42 Pa.C.S. § 9711(d)(7) and (9). Appellant placed others at a grave risk of death when he entered a bar occupied by approximately fifteen people and fired four shots

520

at his intended victim. The record also indicates that Appellant has a history of felony convictions which consists of: criminal conspiracy and aggravated assault, robbery, and first degree murder.

■ Finally, the information compiled by the Administrative Office of Pennsylvania Courts indicates that the sentence imposed in this case is not disproportionate to the sentence imposed in similar cases.

Judgement of sentence affirmed.[17]

LARSEN, J., did not participate in the consideration or decision of this case.

McDERMOTT, J., did not participate in the decision of this case.

CAPPY, J., concurs in the result.

---

**17.** The prothonotary of the Supreme Court is directed to transmit the full and complete record in this case to the Governor. 42 Pa.C.S. § 9711(i).