J-S41009-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| AARON FRAZIER, | |
| Appellant | No. 2712 EDA 2015 |

Appeal from the Judgment of Sentence Entered August 7, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006136-2013

BEFORE:  BENDER, P.J.E., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JULY 05, 2016**

Appellant, Aaron Frazier, appeals from the judgment of sentence of an aggregate term of life imprisonment without the possibility of parole (LWOP), imposed after a jury convicted him of first-degree murder, conspiracy, attempted murder, carrying a firearm without a license, carrying a firearm on a public street in Philadelphia, and possessing an instrument of crime.  On appeal, Appellant challenges evidentiary rulings made by the court, as well certain jury instructions the court provided.  After careful review, we affirm.

The trial court summarized the facts of this case, as follows:

> In June of 2012, [Appellant], Aaron Frazier, was on juvenile probation, subject to GPS electronic monitoring. As part

---

[*] Former Justice specially assigned to the Superior Court.

of his juvenile probation, [Appellant] was restricted from entering a zone between Second Street in the east to Broad Street in the west, and Fisher Street in the north to Louden Street in the south.

On several occasions over the course of July 2012, the tracking device within [Appellant's] GPS ankle bracelet indicated that [he] passed through the restricted area. [Appellant's] probation officers, James Cooney and Ron Kwiatkowski, warned [Appellant] multiple times that such action violated his probation terms.

In late July of 2012, [Appellant] was arrested on the 5400 block of Marvine Street for violation of his parole by crossing into the restricted area. On August 1, 2012, the Honorable Lori Dumas placed [Appellant] under house arrest, to be served at [his] home at 1260 Newkirk Street in North Philadelphia. During this hearing, Judge Dumas admonished [Appellant] for continually violating the terms of his probation and reminded him that he was being monitored electronically.

On August 27, 2012, [Appellant's] GPS monitoring bracelet issued an alert indicating that [he] had cut off the device. On September 4, 2012, Probation Officer Kwiatkowski sought to apprehend [Appellant] at 1260 Newkirk Street, but found that [Appellant] had absconded. The GPS ankle bracelet was never recovered.

On the evening of September 5, 2012, Rashian Morris was sitting on the front porch of his home at 241 Duncannon Street. His home, located three buildings west of the intersection of American Street and W. Duncannon Street, rested within the restricted area subject of [Appellant's] original juvenile probation.

Shortly before midnight of September 6, 2012, David Street and the decedent, Willie Withers, arrived at 241 W. Duncannon Street, and the two men proceeded to smoke cigarettes on the front porch of the home with Morris. After approximately fifteen minutes, Street, who lived next door at 243 W. Duncannon, entered his home to use the bathroom, while Morris and the decedent remained outside. Shortly thereafter, Morris observed three men approach the intersection of American Street and W. Duncannon Street, heading southbound via American Street. Morris observed that two of the

men were near his height, while a third man was significantly shorter.

The three men approached 241 W. Duncannon Street from the corner, and stopped at the home immediately next door to Morris and the decedent, 239 W. Duncannon Street. The three men huddled up near the front gate of 239 W. Duncannon Street, and appeared to have a discussion for approximately three minutes. The three men then broke the huddle and each pointed a handgun in the direction of Morris and the victim. Morris recognized [Appellant] as the shortest of the three men. Morris further observed [Appellant] wearing a distinctive red-hooded sweatshirt and standing in between the other perpetrators.

Morris and the decedent immediately got up and ran towards the front door of 241 W. Duncannon. As he attempted to escape into the home, Morris heard the three perpetrators fire more than twenty shots. Once inside, Mr. Morris and the victim ran up the stairs and stopped in the hallway near the upstairs bathroom.

Just prior to the shooting, Debra Foster, Morris' mother, and her husband James Foster[,] were in the upstairs bedroom of 241 W. Duncannon preparing to sleep. At approximately 12:10 [a.m.], Mrs. Foster heard the gunshots outside her home, got out of bed, and approached the upstairs bathroom. As Mrs. Foster entered the hallway, she observed Morris and the decedent run up the stairs. Mrs. Foster asked the two what had happened outside; Morris told her that they had been shot at on the porch. At that time, Mr. and Mrs. Foster observed the victim clutching his chest. Mr. Foster asked the victim if he had been shot. The victim did not respond to Mr. Foster's questions, and stood in the upstairs hallway in silence.

The decedent collapsed in the hallway near the bathroom approximately ten minutes after he arrived at the top of the stairs. Immediately thereafter, Mr. Foster rushed downstairs and called 911. Mr. Foster called 911 from the downstairs telephone three times. The first call was received at 12:21 a.m. and lasted 28 seconds.

That evening, Officer David Smith was operating a patrol vehicle near 241 W. Duncannon Street. At 12:24 a.m. he received a report of shots fired at 241 W. Duncannon Street. Smith arrived at the scene a minute later and was greeted by

Mr. Foster at the front porch of the residence. Upon entering the home, Officer Smith discovered and followed a blood-trail from the front door, up the stairs, and into the second floor hallway. At the top of the staircase, Officer Smith found the decedent's body lying face down in a pool of blood near the upstairs bathroom. Officer Smith immediately checked the victim for vital signs and found him unresponsive.

At 12:34 a.m., an EMT arrived at 241 W. Duncannon Street and pronounced the victim dead. Dr. Edwin Lieberman, an expert in forensic pathology, performed an autopsy of the decedent. Dr. Lieberman testified that the decedent suffered four gunshot wounds to the shoulder, right breastbone, chest cavity, and right leg. The chest cavity wound was caused by a bullet that entered through the decedent's mid-auxiliary line, fractured his fourth rib, and penetrated left lung, left and right superior pulmonary veins, aorta, bronchus, and right lung lobe. The bullet exited underneath the right shoulder blade. The decedent ultimately succumbed to anoxia, onset by massive internal bleeding and the collapse of both lungs.

At 1:40 a.m., Officer Terry Tull of the crime scene unit arrived in the area of 241 W. Duncannon Street. Officer Tull, alongside Officer Lewis, Officer Perry, and CSI Whitehouse, recovered twenty-five fired cartridge cases ("FCCs") near the vicinity of 241 W. Duncannon Street. The investigators also recovered bullet specimens from the home's front porch and blood samples from within. The investigators also observed extensive damage to the glass door, the screen door, and the storm gutter of the residence caused by gunfire. Officer Tull also determined that the bullet holes found at the scene and the location of the FCCs were consistent with shots being fired on the sidewalk immediately in front of 239 W. Duncannon Street.

Officer Raymond Andrejczak of the Philadelphia Firearms Identification Unit testified that of all twenty-five FCCs found at the scene, eleven FCCs originated from the same .380 cal. handgun, seven FCCs originated form the same .22 cal. handgun, and seven FCCs originated from the same .9mm handgun.

At 1:50 a.m., Morris was taken down to the Homicide Unit for an interview with Detectives Santamala and Pirrone. Morris did not identify [Appellant] during this interview. At trial, Morris testified that he initially refused to identify the shooter out of

- 4 -

fear for his and his family's safety. At 10:20 a.m. the same day, Morris provided a second statement to Detectives Harkens and Bums. Within that statement, Morris described one of the shooters as African-American, between 5'6" and 5'7" in height, and wearing a red-hooded sweatshirt at the time of the shooting. The Detectives then produced a photographic array consisting of eight like males, and Morris identified [Appellant] as the shooter. Morris told detectives that although he had never met [Appellant], he recognized him from numerous prior encounters in the neighborhood.

On October 11, 2012, [Appellant] was arrested on an outstanding absconder's warrant. At the time of arrest, [Appellant] possessed a black Metro PCS cell phone, which was thereafter held by prison authorities.

On November 5, 2012, Detective Peterman discovered that [Appellant] was in custody and retrieved [his] cell phone from prison authorities. On December 5 and December 17, 2012, Detective Peterman asked for and received warrants to search the contents of [Appellant's] phone and the [Appellant's] cellular phone account information, respectively. Detective Peterman forwarded that evidence to Detective James Dunlap of the Philadelphia Police Homicide Unit and Agent Bill Shute of the Federal Bureau of Investigation for further investigation.

At trial, Detective Dunlap, a qualified expert in cell phone analysis, testified that he had received the Metro PCS records for [Appellant's] phone for the period covering August 31, 2012 through December 17, 2012. Detective Dunlap testified that he and Agent Shute analyzed the historical cell data of [Appellant's] phone. This analysis allowed them to isolate fifteen calls made from [Appellant's] phone between 11:54 p.m. on September 5, 2012 and 1:12 a.m. on September 6, 2012, and to cross reference that data with cellular tower records to determine the approximate location of [Appellant's] phone at the time the call was made. Detective Dunlap's analysis determined that on September 6, 2012 at 12:00 a.m., [Appellant's] phone was several blocks north of the crime scene; at 12:10 and 12:11 a.m., at around the time of the murder, [Appellant's] phone was in the vicinity of 241 W. Duncannon; and at 12:14 a.m., after the murder occurred, [Appellant's] phone was several blocks west of the crime scene.

…

Both at trial and during a preliminary hearing held on May 8, 2013, Morris identified [Appellant] as the shooter wearing a red-hooded sweatshirt at the time of the murder.

Prior to trial, [Appellant] proffered a motion *in limine*, wherein he sought to admit the testimony of Dr. Suzanne Mannes on the issues of exposure, time, weapon focus, stress, the effect of lighting on a witness' testimony, and unconscious transference. During a pretrial hearing held on August 3, 2015, Dr. Mannes testified that the common person has only a superficial understanding of how lighting could affect an eyewitness' ability to identify a suspect. Dr. Mannes provided no evidence to support her assertion. This Court granted the motion in part and permitted Dr. Mannes to testify on the variables of exposure time, weapon focus, and stress, and barred her from testifying on lighting and unconscious transference.

At trial, Dr. Mannes testified that factors such as exposure time, weapon focus, stress, distance, potential bias, identification instructions, and potential differences in sequential and simultaneous line-ups each have an effect on an eyewitness' ability to remember and possibly identify an assailant. Dr. Mannes did not testify on the issue of lighting.

Trial Court Opinion (TCO), 11/6/15, at 2-8 (citations to the record omitted).

Following Appellant's jury trial in August of 2015, he was convicted of the above-stated offenses. On August 7, 2015, he was sentenced to an aggregate term of LWOP for his first-degree murder conviction. Appellant filed a timely post-sentence motion, which was denied. He then filed a timely notice of appeal, and also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court filed an opinion on November 6, 2015. Herein, Appellant presents four issues for our review:

I. Whether the lower court erred in granting the Commonwealth's motion to introduce other crimes evidence

- 6 -

where the prior bad acts in question ([Appellant's] cutting of a GPS monitor) had no established nexis [*sic*] to the incident giving rise to the charges in this case?

II. Whether the lower court err[ed] in giving a conscious[ness] of guilt instruction for conduct that occurred before the murder in question and was not connected to the murder in any way?

III. Whether the lower court err[ed] in denying [Appellant's] motion *in limine* to introduce the expert testimony of Dr. Suzanne Mannes relating to the effects of lighting on the reliability of [eyewitness] identification?

IV. Whether the lower court erred in not giving the [identification] instruction proffered by the defense and instead using its own as the court's instruction failed to advise the jury as to when it must treat an eyewitness' testimony "with caution," a requisite of Pennsylvania law. In addition, the court's instruction failed to explain how the jury was to consider issues such as "stress," as the court's instruction as worded permitted jurors to use such factors to conclude that the identification was more reliable, a position contrary to science?

Appellant's Brief at 3-4.

In Appellant's first issue, he asserts that the court erred by permitting the Commonwealth to introduce prior bad acts evidence, namely that he removed his GPS ankle monitor several days before the murder. Appellant contends that this evidence was improperly admitted because it was irrelevant, as "[t]he record … is devoid of any evidence that [Appellant's] GPS device was removed as part of a plan related to the shooting in question or was integral to it in any other way." Appellant's Brief at 16. Appellant also baldly asserts, without any supporting argument, that the prior bad acts evidence was "grossly prejudicial." *Id.*

Initially, we note that,

> [t]he standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit evidence is well settled. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Young*, 989 A.2d 920, 924 (Pa. Super. 2010) (internal citations omitted).

Additionally, this Court has explained:

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.

*Commonwealth v. Aikens*, 990 A.2d 1181, 1185 (Pa. Super. 2010) (some internal citations omitted).

Here, the trial court admitted the evidence that Appellant removed his GPS ankle bracelet days before the murder, concluding that such evidence was relevant to show his "intent, preparation, premeditation, and as part and parcel of the history and natural development of the case." TCO at 9. The trial court explained:

> The Pennsylvania Supreme Court's holding in *Commonwealth v. Tedford*, 567 A.2d 610 (Pa. 1989)[,] is illustrative on this issue. In *Tedford*, the trial court permitted

the introduction of evidence that the appellant participated in a prison work release program and was granted a furlough at the time he raped and murdered his victim. [*Id.*] at 621. On the night of the murder, the appellant broke a pre-arranged social engagement and at the time of the engagement was originally scheduled, he raped and murdered his victim at the office where he was employed. *Id.* at 622. The Pennsylvania Supreme Court reasoned that the jury could, and did, infer that the appellant, while on furlough, broke his prior engagement in order to commit murder at his place of work. *Id.* The Supreme Court ultimately held that the bad acts evidence of the work release program and the furlough were properly admitted to establish premeditation, opportunity, and the appellant's intent to rape and murder his victim. *Id.*

Evidence of [Appellant's] prior bad acts was admissible in this case for the same reasons provided in *Tedford*: to show premeditation, opportunity, plan, and intent. The facts demonstrate that [Appellant] was restricted from entering a zone between Second Street and Broad Street east to west; and Fisher Street and Louden Street north to south. Probation authorities were alerted each time [Appellant] passed nearby or within the restricted area, and each time he did, probation authorities reminded [Appellant] that he was being monitored. These facts indicate that [Appellant] was not only on notice of the restriction, but that probation authorities knew when [Appellant] entered the restricted area and where he was located. [Appellant] cut off his GPS tracking device on August 27, 2012, which prevented the Commonwealth from further monitoring his movements. The shooting occurred within the restricted area.

These inferences, taken together, establish that [Appellant] removed the GPS device for the purpose of entering the restricted area. Through that, the jury could make the reasonable inference that [Appellant] sought to enter the restricted area undetected to commit an act within. In this case, that act was the murder of Willie Withers. If [Appellant] was still being monitored at the time of the murder, he would have been denied the opportunity to kill the decedent. These combined inferences demonstrate premeditation and [Appellant's] opportunity, plan and intent to commit murder. The evidence was therefore properly admitted.

The challenged evidence was also admissible because it forms the chain and sequence of events that form the history of the case as part of its natural development. The challenged evidence shows the jury that [Appellant's] arrest for absconding led to the confiscation of his phone. Analytical data from that phone provided the jury with cellular tower analysis that placed [Appellant] near the crime scene at the time of the shooting. If this major link in the chain of evidence were removed, the jury would be deprived of the complete story and be forced to deliberation in a vacuum.

TCO at 10-12 (citations to the record and one case citation omitted).

Additionally, the trial court stressed that it provided the jury with a cautionary instruction, directing that they were to consider the evidence that Appellant was on probation and cut off his GPS monitor "for a limited purpose, that is, for the purpose of tending to show … planning, and/or meditation and/or intent to commit the crimes charged." *Id.* at 12 (quoting N.T. Trial, 8/6/15, at 41-43). The court instructed the jury that it "must not regard this evidence as showing that [Appellant] is a person of bad character or criminal tendencies from which you might be inclined to infer guilt." *Id.*

Considering the reasons provided by the trial court for admitting the prior bad acts evidence, and the cautionary instruction the court provided to the jury, we conclude that Appellant has failed to demonstrate that the court abused its discretion in admitting this evidence. Accordingly, Appellant's first claim is meritless.

In his second issue, Appellant challenges the court's decision to provide a 'consciousness of guilt' jury instruction.

The standard of reviewing trial court instructions to the jury is well settled:

- 10 -

> When reviewing a challenge to a part of a jury instruction, the Court must review the jury charge as a whole to determine if it is fair and complete. A trial court has broad discretion in phrasing its charge and can choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

*Commonwealth v. Myers*, 722 A.2d 1074, 1076 (Pa. Super. 1998) (internal citation omitted).

Appellant argues that the court erred by instructing the jury that his removal of the GPS ankle bracelet could be considered as evidence of his consciousness of guilt. Specifically, the court instructed the jury:

> You have heard evidence that [Appellant] was on probation and cut off his GPS bracelet prior to the alleged crime.
>
> This evidence is before you for a limited purpose, that is, for the purpose of tending to show consciousness of guilt[.]
>
> The credibility, weight, and effect of this evidence is for you to decide. Generally speaking, when a crime has been committed and a person thinks he is, or may be, accused of committing it, and he flees or conceals himself, such flight or concealment does not necessarily show consciousness of guilt … in every case. A person may flee or hide for some other motive and may do so even though innocent. Whether evidence of flight or concealment in this case should be looked at as tending to prove guilt depends upon the facts and circumstances of this case and especially upon motives that may have prompted the flight or concealment.
>
> You may not find [Appellant] guilty solely on the basis of evidence of flight or concealment.

N.T. Trial, 8/6/15, at 41-43.

Appellant asserts that this instruction,

> focused on [Appellant's] removal of his GPS bracelet, 'prior to,' the shooting in question as opposed to [conduct] occurring after

- 11 -

the crime. It was simply impossible for this action to be indicative of consciousness of guilt for the shooting since the shooting had not yet occurred. As a result, the trial court's consciousness of guilt instruction was clearly erroneous. *Commonwealth v. Babbs*, 499 A.2d 1111 (Pa. Super. 1985) (consciousness of guilt instruction erroneous since no necessary connection between failure to appear for trial and consciousness of guilt).

Appellant's Brief at 18.

The only case Appellant cites in support of his argument is irrelevant to the specific issue he raises. In *Babbs*, this Court held that the failure of a defendant to appear *for trial*, without evidence of flight or concealment, is insufficient to permit the fact-finder to infer consciousness of guilt. *Babbs*, 499 A.2d at 1114. Here, Appellant did not fail to appear for trial, and he offers no discussion of how the facts of *Babbs* are analogous to this case. Thus, his reliance on *Babbs* is unconvincing.

Nevertheless, we acknowledge that our Supreme Court has stated, in the context of assessing an ineffective assistance of counsel claim, that "a defendant cannot be conscious of guilt regarding a crime which has not yet been committed." *Commonwealth v. Paddy*, 800 A.2d 294, 323 (Pa. 2002). Thus, *Paddy* supports Appellant's argument that the court's instruction was improper, as it focused *only* on his act of removing the GPS bracelet prior to the murder.

However, we cannot conclude that the court's instruction constitutes reversible error. First, there was evidence offered at trial to support a consciousness of guilt jury charge. Namely, the Commonwealth

demonstrated that Appellant knew the GPS ankle bracelet was conducting ongoing monitoring of his location. By cutting off that bracelet, Appellant was not only concealing his location so he could *commit* the murder, but he was also concealing himself *following* the murder, especially because he did not reattach the bracelet after the shooting. These facts demonstrate active concealment on the part of Appellant that began before the murder, but also continued after the crime was committed. Thus, a consciousness of guilt instruction was warranted, and the technically inaccurate instruction given does not warrant reversal. *See Commonwealth v. Bruce*, 717 A.2d 1033, 1037-38 (Pa. Super. 1998) (emphasis added) ("Generally, the trial court can use a flight/concealment jury charge when a person commits a crime, knows that he is a suspect, and conceals himself, because such conduct is evidence of consciousness of guilt, which may form the basis, along with other proof, from which guilt may be inferred.") (citation omitted); *see also Commonwealth v. Prosdocimo*, 578 A.2d 1273, 1276 (Pa. 1990) ("We will not rigidly inspect a jury charge, finding reversible error for every technical inaccuracy, but rather evaluate whether the charge sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision.").

Additionally, even if the consciousness of guilt instruction was not appropriate, we are confident that the court's providing that jury charge did not control the outcome of Appellant's case. *See Commonwealth v. Brown*, 911 A.2d 576, 582-83 (Pa. Super. 2006) ("In examining the

- 13 -

propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case.") (citation omitted). An eyewitness to the murder repeatedly identified Appellant as being one of the three shooters who gunned down the victim, and data recovered from Appellant's cell phone confirmed that he was in the location of the shooting when it occurred, and quickly left the area afterwards. Accordingly, even if the court erred by providing a consciousness of guilt instruction, that charge did not control the jury's verdict in the case and, therefore, does not warrant a new trial.

In Appellant's third issue, he argues that the trial court erred by precluding his expert, Dr. Suzanne Mannes, from testifying about "the effects of lighting on the reliability of eyewitness testimony." Appellant's Brief at 19.[1] "Under our Rules of Evidence, expert testimony is permitted when the expert's scientific, technical, or other specialized knowledge is

_____

[1] We note that "[f]or over twenty years, Pennsylvania case law placed a *per se* ban on expert testimony regarding the reliability of eyewitness identification, holding that such testimony would 'intrude upon the jury's basic function of deciding credibility.'" ***Commonwealth v. Selensky***, 117 A.3d 1283, 1284-85 (Pa. Super. 2015) (citations omitted). However, in ***Commonwealth v. Walker***, 92 A.3d 766 (Pa. 2014), our Supreme Court "reversed course, holding that 'the admission of expert testimony regarding eyewitness identification is no longer *per se* impermissible in our Commonwealth[.]'" ***Selensky***, 117 A.3d at 1285 (quoting ***Walker***, 92 A.3d at 792–93). Rather, "trial courts must exercise their traditional role in determining the admissibility of [such] expert testimony, including pursuant to Rules 401, 403, and 702 of the Pennsylvania Rules of Evidence." ***Id.***

beyond that of the average layperson and will help the fact-finder to understand the evidence or determine a fact in issue." ***Commonwealth v. Alicia***, 92 A.3d 753, 760 (Pa. 2014) (citing Pa.R.E. 702(a) and (b), and ***Commonwealth v. Lopez***, 854 A.2d 465, 470 (Pa. 2004)).

Preliminarily, we reiterate that the trial court allowed Dr. Mannes to offer expert testimony regarding how an eyewitness' ability to remember and identify an assailment is impacted by "factors such as exposure time, weapon focus, stress, distance, potential bias, identification instructions, and potential differences in sequential and simultaneous line-ups…." TCO at 8. However, the trial court precluded Dr. Mannes from offering "expert testimony on the effect of lighting on eyewitness testimony…." ***Id.*** at 19. The court explained its ruling as follows:

> At the pre-trial hearing, [Appellant] failed to establish how expert testimony on the effects of lighting either assists the jury or how such effects are beyond the understanding of the average person. During his cross-examination of Dr. Mannes, the Commonwealth elicited that the effect of shadows and darkness on a witness' ability to identify a human face was within a layperson's understanding. N.T. 8/3/2015 at 35-36. While Dr. Mannes opined that the layperson's understanding was superficial, she provided no further facts or evidence to support her assertion. ***Id.*** at 36-37. [Appellant] therefore failed to meet his burden.
>
> Common sense indicates that human beings have better vision in good lighting than in bad lighting. In the instant case, the shooting occurred near a well-lit corner. N.T. 8/4/2015 at 55, 119, 175. At trial, defense counsel investigated factors such as the location of the lighting, the distance between the shooter and the eyewitness, and the time of day. ***Id.*** at 121-123, 199-200. The jury was therefore aware of the issues of fact surrounding the quality of lighting at the time of the shooting.

> Whether [Rashian] Morris accurately identified [Appellant] as a shooter, given the quality of lighting at the time of the shooting, is a factual determination left to the jury. [Appellant's] argument is therefore without merit.

TCO at 19-20.

On appeal, Appellant attacks the court's conclusion that he failed to present sufficient evidence to demonstrate that Dr. Mannes has a specialized knowledge, beyond that of the average layperson, regarding the effect of lighting on eyewitness testimony. Appellant contends that such evidence was set forth in a report authored by Dr. Mannes, which he attached to his motion seeking to admit her expert testimony. Specifically, Appellant quotes the following portion of Dr. Mannes' report:

> iii. Lighting - We know that low levels of lighting are associated with poor eyewitness identification, but more important to visibility is contrast. Thus, knowledge about the amount of illumination (measured in lux) coming from the available sources of light does not determine the quality of vision. In order to evaluate this, the amount of light that is reflected from the individual and his or her surrounding context, luminance (measured in candela), must be measured. This quantity can be adequately captured using a luminance photometer. From what we know about light and color, we also know that black faces will reflect less light than white faces and produce lower levels of luminance regardless of lighting conditions…. Research has shown that a change in the shadow cast upon an individual's face (*i.e.* a change in illumination direction) can impair identification…. Pairs of the same (or different) faces were shown to participants with the task of saying the faces either were or were not a match. The faces were illuminated from either the same or a different direction. When the illumination direction was different, ability to say the faces were the same declined to 85%.
>
> The position of the light source in relation to the object being observed is also important. If an object is backlit (the source of light coming from behind the object[)], then there will be

little opportunity for the light to reflect off of the front of the object and it will be less visible.

Motion *in Limine* - Exhibit B (Dr. Mannes' report), 7/6/15, at 4-5. Appellant asserts that this portion of Dr. Mannes' report demonstrates that her

scientific findings were well beyond the knowledge of a layperson and, moreover, were highly relevant since Rashian Morris made his observations at night, on a dark[] street in which the shooters were huddled and thus turned to him at various angles. Nevertheless, the lower court precluded this testimony. This was clearly erroneous since this scientific testimony would obviously have aided the trier of fact.

Appellant's Brief at 19-20 (citation omitted).

Appellant has failed to convince us that the trial court abused its discretion in precluding this specific expert testimony. Certainly, the above-quoted portion of Dr. Mannes' report utilizes scientific terms that would be beyond the knowledge of the average layperson. However, Appellant curiously omits, from the above-quoted portion of the report, Dr. Mannes' conclusory paragraph, in which she states:

CONCLUSION: In this case the witness clearly specifies that it was dark out when the incident occurred. The witness claims that the porch light was not on giving no light that would illuminate [Appellant's] face. Additionally, the dark circumstances under which the event was witnessed are different from other daytime circumstances under which [Appellant] may have been viewed.

Motion *in Limine* - Exhibit B (Dr. Mannes' report) at 5.

Dr. Mannes' conclusory paragraph in her report did not address how Morris' identification was impacted by the fact that the "shooters were huddled and thus turned to him at various angles[,]" as Appellant contends

- 17 -

on appeal. Instead, Dr. Mannes' conclusions suggest that because it was dark at the time of the shooting, and there was no light to illuminate Appellant's face, Morris' identification may be less reliable than an identification made during daylight hours. Clearly, such an inference is within the knowledge of a layperson. Additionally, Dr. Mannes offered no further testimony at the pretrial hearing to support her assertion that a layperson has only a 'superficial' understanding of the impact of lighting on an eyewitness' identification. *See* TCO at 19. Based on this record, we ascertain no abuse of discretion in the court's decision to preclude Dr. Mannes' expert testimony on this issue.

In Appellant's final claim, he argues that the trial court erred by not providing his proposed jury instruction pertaining to how the jury should assess Rashian Morris' identification testimony. To begin, we reiterate that,

> [i]n reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this [C]ourt to determine whether the record supports the trial court's decision. In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

***Brown***, 911 A.2d at 582-83 (quoting ***Commonwealth v. Thomas***, 904 A.2d 964, 970 (Pa. Super. 2006) (quotation and citations omitted)).

In his brief, Appellant sets forth the instruction provided by the trial court, as well as his proposed jury instruction. ***See*** Appellant's Brief at 11-14. First, the instruction provided by the trial court included, in pertinent part, the following:

> In his testimony[,] Rashian Morris identified the defendant as the person who committed the crimes. In evaluating this testimony in addition to all the instructions that I just gave you about judging the testimony of witnesses, there are additional factors to consider because a witness can sometimes make a mistake when trying to identify a criminal, so you use all those other factors that I have given you and then you can review the following: You should ask whether the witness was able to observe and had an adequate opportunity to observe the person or persons who committed the crime or crimes charged in this case.
>
> Many factors affect whether a witness has an adequate opportunity to observe a person or persons committing a crime. These factors include the length of time during which the witness observed the person or persons, the distance between the witness and the person or persons alleged to have done the crime, the lighting conditions, how closely the witness was paying attention to the person or persons, whether the witness was under stress while observing the person or persons who committed the crime, whether the witness knew the person or persons from prior experience and whether the person or persons committing the crime were of different races.
>
> …
>
> You may also consider the testimony of Dr. Mannes who gave testimony about factors bearing on stress, distance, exposure time, weapon focus, potential bias and identification instructions and potential differences in sequential and simultaneous lineups. You must consider that testimony in

- 19 -

accordance with the instructions that I gave you concerning expert testimony.

Remember that in considering whether or not to accept the eyewitness testimony of Mr. Morris, you must consider all of the circumstances under which the identification or identifications were made. Furthermore, you should consider all the evidence relevant to the question of who committed the crime, including the testimony of any other witness from which identity or non-identity of the perpetrator of the crimes may be inferred.

N.T. Trial, 8/6/15, at 45-46, 47-48.

Appellant contends that in its instruction, the court "merely listed the various factors that could potentially affect the reliability of eyewitness testimony[,]" but it did not "explain how the jury was to consider such issues…." Appellant's Brief at 21. For instance, Appellant proposed instructing the jury as follows:

Here are some of the factors to consider [in determining whether to receive eyewitness testimony with caution]:

- How stressful was the event?[] Scientific studies have shown that stress can negatively affect the accuracy of memory. In other words, with very high stress, a witness' memory may be fragmented or distorted.

- Was a weapon present? Scientific studies have shown that when a weapon is present, two things may happen - stress may be increased, and the witness' attention may be on the weapon and thus less on the perpetrator's face.

- How much time passed between the crime and the first identification? People don't forget major events - just think, all of us will never forget September 11, 2001. But people often forget details of even critical events, and scientific studies have shown that can happen within a matter of hours. So, the less time between the crime and first identification, the better to ensure an accurate and reliable identification later; the more time

> that has passed, the more chance there is that some detail has been forgotten.

***Id.*** at 12.

Appellant's argument fails to convince us that the court's omission of his more elaborate jury instruction amounted to a fundamental error. ***See Brown***, 911 A.2d at 583 ("A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error."). Rather, we agree with the trial court that,

> [r]ead as a whole, the identification charge [provided by the court] is clear, adequate, and accurate statement of the law. This court specifically focused the juror[s'] attention upon Morris' opportunity to observe [Appellant] and highlighted the factors that influence an eyewitness' ability to identify a perpetrator, including lighting conditions, distance, stress, and exposure time. This [c]ourt therefore ensured [Appellant] a fair jury evaluation of the reliability of Morris' identification.

TCO at 17-18. The court also noted that it "clearly directed the jury to carefully consider the variables influencing eyewitness identification proffered by Dr. Mannes in her direct testimony...." ***Id.*** Finally, the court stressed, and we agree, that it was

> not obligated to adopt [Appellant's] suggested words or phrases. By instructing the jury on the factors discussed by Dr. Mannes, this [c]ourt illuminated all of the relevant identification factors. The jury was therefore free to consider the full range of arguments regarding identification during deliberation. This Court committed no error in administering the challenged instruction.

***Id.***

- 21 -

Moreover, Appellant has not demonstrated that he was prejudiced by the instruction provided. ***See Brown***, 911 A.2d at 583 ("The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal *unless the appellant was prejudiced by that refusal*.") (emphasis added). Appellant essentially suggests that the court's identification instruction was erroneous because it permitted the jury to decide whether each factor weighed for, or against, the reliability of Morris' identification. ***See*** Appellant's Brief at 21 ("Unlike [Appellant's] proffered instruction, the court's charge … failed to explain how the jury was to consider such issues thereby leaving open the possibility that [the] fact[-]finder could find Mr. Morris's testimony more reliable based on these considerations."). Appellant claims that the jury's "potential finding" that certain factors demonstrated the *reliability* of Morris' identification "would clearly be at odds with the settled science embraced by the ***Walker*** Court." ***Id.*** at 21.

We disagree. While our Supreme Court in ***Walker*** accepted that "the possibility of mistaken identification is real[,]" and that, "it is now widely known that eyewitness misidentification is the leading cause of wrongful conviction across the country[,]" the Court did not hold that *every* factor considered by the jury in assessing eyewitness identification evidence must weigh *against* finding such evidence reliable. ***Walker***, 92 A.3d at 781 (citation omitted). Here, the court's instruction clarified the factors the jury should consider in determining whether to credit Morris' identification of

- 22 -

Appellant as one of the shooters; the court properly left it in the province of the jury to determine if those factors weighed for, or against, the reliability of that identification. Thus, Appellant has not demonstrated that the court's decision not to provide his requested instruction caused him prejudice and requires a new trial.

Judgment of sentence affirmed.


Judgment Entered.



Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/5/2016